**Michael B. SELSOR, Plaintiff–Appellant,**

**v.**

**Stephen W. KAISER, Defendant–Appellee.**

**No. 94–5223.**

United States Court of Appeals,
Tenth Circuit.

April 8, 1996.

Regina Stephenson, Assistant Federal Public Defender (Stephen J. Knorr, Federal Public Defender, with her on the brief), Tulsa, Oklahoma, for Plaintiff–Appellant.

Diane L. Slayton, Assistant Attorney General (W.A. Drew Edmondson, Attorney General, with her on the brief), Oklahoma City, Oklahoma, for Defendant–Appellee.

Before EBEL, HOLLOWAY and KELLY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Petitioner–Appellant Michael B. Selsor appeals from the district court's denial of his petition for a writ of habeas corpus. The judge rejected Selsor's constitutional claim of denial of effective assistance of counsel where two public defenders were required by the state trial court to represent the interests of both Selsor and his codefendant Richard Dodson despite timely objections by the attorneys and Selsor that Dodson's and Selsor's interests conflicted. We disagree with the ruling below.

# I

## FACTUAL BACKGROUND

On September 15, 1975, a U–Tote–M store in Tulsa, Oklahoma, was robbed. One of the store employees, Clayton Chandler, was shot to death and the other, Ina Morris, was shot and wounded. Selsor and Dodson were arrested for the robbery and shootings. Selsor

was charged in state court with robbery with firearms in violation of 21 O.S.Supp.1973, § 801; shooting with intent to kill in violation of 21 O.S.1971, § 652; and murder in the first degree in violation of 21 O.S.Supp.1973, § 701.1. Dodson was charged with robbery with firearms, after former conviction of a felony in violation of 21 O.S.Supp.1973, § 801; shooting with intent to kill, after former conviction of a felony in violation of 21 O.S.1971, § 652; and murder in the first degree in violation of 21 O.S.Supp.1973, § 701.1. Selsor and Dodson were tried together and were both jointly represented by the same two public defenders from the same office. One attorney conducted both defenses while the other attorney supervised that attorney. *Selsor v. Kaiser*, 22 F.3d 1029, 1031 (10th Cir.1994) (*Selsor I* ).

At trial Ina Morris, the U–Tote–M employee wounded in the robbery, testified about the ordeal. She stated that she had gone into the store's walk-in cooler, and that while in there "[a] man walked up to the first window [of the cooler] and opened it up and looked at me." State Tr. at 183. She said the man then walked around to the big walk-in door and pointed a revolver at her. *Id.* at 184, 186. He told her to get on her knees on the floor. *Id.* at 186. She testified that she "just looked at him" because she "couldn't believe it." *Id.* She said to the gunman "You've got to be kidding." *Id.*

The gunman then fired a shot at her, hitting her in the right shoulder. State Tr. at 187. She got down on her knees. The gunman told her that if she looked up he would kill her. *Id.* at 188. Three to five minutes later Morris raised her head and saw the gunman standing outside the window, holding both hands on the gun. *Id.* at 190–91. She then saw him pull the trigger and heard the bullets hit the window. She ducked. *Id.* at 191. She heard more than two bullets fired. Her body went numb. *Id.* at 192. She lay down and lost consciousness. She was wounded in her right shoulder, on the right side of the back of her head, on top of her head, underneath her jaw, in her back and in her neck. *Id.* at 199. Two bullets were left in her neck. *Id.*

Morris regained consciousness approximately five to seven minutes later. State Tr. at 193. She walked north in the cooler and looked out to see Clayton Chandler lying on the floor of the U–Tote–M. *Id.* at 194. Mr. Chandler died as a result of his injuries.

Morris identified Dodson as the man who shot her. *Id.* at 204. She gave no testimony about seeing any assailant other than Dodson, nor did she testify that she heard any shots other than those from Dodson. She did state, however, that the door to the walk-in cooler was closed and that she heard the cooler fan, a noise she described as "[v]ery loud." *Id.* at 189.

Ms. Morris was the only eyewitness to the crime and her testimony did not implicate Selsor. The evidence against Selsor instead was based on his and Dodson's confessions as presented through the testimony of two police officers, Officer Evans, a major crimes investigator for the Santa Barbara, California Police Department, and Officer Roberts of the Tulsa Police Department.

Officer Evans testified that on September 22, 1975, he and a Sergeant Williams interviewed Dodson at the Santa Barbara Police Department. State Tr. at 238. Officer Evans testified that

[Dodson] stated that he and Mr. Selsor were driving a green '67 Pontiac.... He stated that they had been together in this car on the evening of September 15th around 11:00 P.M. and had passed by this U–TOTE–M store which he thought was located at 66th and 33rd, in that vicinity. He stated that both of them were in the car as they passed by this store a couple of times and Mr. Dodson stated that he noticed that the traffic was light around the store and the outlying area and that there was a light fog or something. He then stated that they both were armed.

....

Q And, what did he say in that regard?

A Mr. Dodson was armed with a nine shot .22 caliber revolver, black and silver and Mr. Selsor was armed with a .22 automatic Lugger Blackhawk.

Q Now, did he say anything in regard to any plan concerning this matter on 33rd

West Avenue other than what you have thus far related?

A Yes, he did.

Q What did he say in that regard?

A He stated that prior to entering the store in a conversation with Mr. Selsor there was discussion of taking these people out.

. . . .

Q Did he ever indicate in the conversation what he meant by taking them out?

A Later in the conversation it was shown that taking them out meant killing them.

Q And, when you use the expression, taking these people out, did you know at the time he told you this who he had reference to?

A By name or incident?

Q Well, by perhaps position with the store?

A Yes, meaning the proprietors of the store.

State Tr. at 277–79.

Officer Evans also testified about an interview that he and a Detective Martin had with Selsor subsequent to the interview with Dodson. Officer Evans stated that Selsor said "that he and Mr. Dodson had approached the U–Tote–M store at 61st and 33rd Street and they were in a green '67 Pontiac of [sic] which belonged to Mr. Selsor." State Tr. at 283. Selsor stated that they "didn't intend to have any witnesses around and had planned on killing the proprietors after the robbery." *Id.* Evans testified that Selsor said "that he was armed with a .22 caliber Lugger Blackhawk automatic, had a nine shot clip, and that Mr. Dodson was armed with a nine shot .22 caliber revolver." *Id.* at 284.

Officer Evans then recounted Selsor's description of the robbery:

Mr. Selsor stated he demanded the money in a sack and he said the elderly gentleman complied and gave him the money from the cash drawer, the cash register and the safe. Mr. Selsor stated that he told the guy to quit piddling with the change as he was putting the money in, he wasn't interested in that. I asked Mr.

Selsor what then occurred and he stated that he had off-set his position, showing me in the interview room, and fired several shots from this .22 automatic into the elderly man.

*Id.* at 285. According to Evans, Selsor "stated that all the bullets went into the chest area and it [sic] must have hit the heart." *Id.* at 286.

In addition to the testimony of Officer Evans, Officer D.A. Roberts of the Tulsa Police Department testified about a conversation he had with Dodson at the Tulsa County Jail on September 30, 1975. Officer Roberts said that

We started the conversation off, I advised him I'd like to know how it went down and the order that it happened. He related it started with a conversation between himself and Selsor, that Selsor had said, We got to take out the witnesses involved in this case.

. . . .

At that time I asked him if he felt Selsor really meant that. He said, Well, he convinced me of it. He said, I thought he did, he looked serious.

State Tr. at 358–59.

The state introduced the .22 caliber revolver used by Dodson. *Id.* at 288, 305. The .22 caliber automatic allegedly used by Selsor was not introduced. However, Officer Roberts testified that Dodson told him Selsor threw the gun into some body of water along Interstate 80. In addition, the state introduced spent shell casings recovered from the crime scene which an expert testified came from an automatic weapon. State Tr. at 227–29, 376–77.

The defense made no opening statement. The only witness called by the defense was Dr. Garcia, a forensic psychiatrist from Eastern State Hospital at Vinita, Oklahoma, who testified only about Dodson's mental condition. State Tr. at 381–86. The defense closing argument was brief, constituting a mere two pages of the trial transcript and in essence simply asserting that the jury should not take the defendants' lives. *Id.* at 406–07.

Selsor was convicted of armed robbery, shooting with intent to kill, and first degree

murder. He was sentenced to 20 years' imprisonment for shooting with intent to kill, 25 years' imprisonment for armed robbery, and for the murder conviction, he was sentenced to death. The Oklahoma Court of Criminal Appeals affirmed Selsor's convictions and sentences except the death sentence which was modified to life imprisonment. *Selsor v. State,* 562 P.2d 926 (Okla.Crim.App.1977).[1] Dodson was convicted of shooting with intent to kill after former conviction of a felony and robbery with firearms after former conviction of a felony, but was acquitted of first degree murder. Dodson was sentenced to 199 years for shooting with intent to kill and 50 years for the armed robbery conviction. His convictions and sentences were affirmed. *Dodson v. State,* 562 P.2d 916 (Okla.Crim. App.1977).

## II

### POST-CONVICTION PROCEEDINGS

On November 8, 1978, Selsor filed an application for post-conviction relief in state court. That petition was denied on February 29, 1980, and the denial was affirmed in an unpublished order of the Oklahoma Court of Criminal Appeals on June 11, 1980. On July 3, 1989, Selsor filed a second application for post-conviction relief in state court. That application was denied on July 24, 1989, and that ruling was affirmed by the Oklahoma Court of Criminal Appeals in an unpublished order on August 18, 1989.

On October 21, 1991, Selsor filed a pro se petition for federal habeas relief in the Northern District of Oklahoma, claiming in essence that

(1) he was denied his Sixth Amendment right to the effective assistance of counsel because of his attorney's conflict of interest—*i.e.,* the same attorney represented both Petitioner and Dodson; and (2) the separate convictions and sentence for felony murder and the underlying felony—*i.e.,*

armed robbery, violated the Double Jeopardy Clause of the Fifth Amendment.

*Selsor I,* 22 F.3d at 1031.

On December 4, 1992, the federal district court denied the petition on its merits. On appeal we affirmed the district court's rejection of Selsor's double jeopardy claim but reversed and remanded for further proceedings on the claim of ineffective assistance of counsel. *Id.* at 1036. We held that Selsor's case was controlled by *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and directed the district court on remand to "determine whether: (1) Petitioner's objection at trial to the joint representation was timely, and, if so, (2) whether the trial court took 'adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel.'" *Selsor I,* 22 F.3d at 1033–34 (quoting *Holloway,* 435 U.S. at 484, 98 S.Ct. at 1178).

On remand the district judge concluded that Selsor's objection to the joint representation was timely. I R. doc. 29 (Order of November 10, 1994) at 2. However, he held that the state trial court made an adequate inquiry into the possibility of a conflict of interest and denied Selsor's petition. Selsor appeals.

## III

### THE CLAIM OF DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL

 The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The Sixth Amendment guarantees a defendant in a federal criminal case the right to effective assistance of counsel, *Powell v. Alabama,* 287 U.S. 45, 66–68, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932), and this means "the effective

---

**1.** At the time of the crime, the only punishment in Oklahoma for first degree murder was death. 21 O.S.Supp.1973, § 701.3. Thus, there was no sentencing phase. In *Riggs v. Branch,* 554 P.2d 823 (Okla.Crim.App.1976), the court concluded that this death penalty provision had been effectively stricken from the Oklahoma first degree

murder statute. *Id.* at 827. In *Selsor v. State,* 562 P.2d 926, 927 (Okla.Crim.App.1977), the court, citing *Riggs,* agreed with Selsor's assertion that § 701.3 was unconstitutional. The court therefore modified Selsor's death sentence to life imprisonment. 562 P.2d at 931.

assistance of competent counsel." *United States v. Gallegos,* 39 F.3d 276, 277 (10th Cir.1994). The Fourteenth Amendment makes this right applicable to the states. *Id.* "The Sixth Amendment right to effective assistance of counsel encompasses the 'correlative right to representation that is free from conflicts of interest.'" *United States v. Cook,* 45 F.3d 388, 393 (10th Cir.1995) (quoting *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981)). Whether Selsor received effective assistance of counsel or waived any conflict of interest is a mixed question of fact and law, reviewed de novo. *See Hamilton v. Ford,* 969 F.2d 1006, 1010 (11th Cir.1992), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993).

## A

### *Holloway v. Arkansas* Principles

In *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the Supreme Court held that where there were timely objections to joint representation, and accompanying representations by counsel on the probable risk of a conflict of interests, and the trial judge failed either to appoint separate counsel or take adequate steps to ascertain whether the risk of conflict of interest was too remote to warrant separate counsel, the defendants were deprived of their Sixth Amendment guarantee of "assistance of counsel." *Id.* at 484, 98 S.Ct. at 1179. Thus, "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Id.* at 488, 98 S.Ct. at 1181. *See also Selsor I,* 22 F.3d at 1033 (where a defendant timely objects to joint representation and the judge fails to make adequate inquiry or appoint separate counsel, prejudice is presumed); *United States v. McCullah,* 76 F.3d 1087, 1098–99 (10th Cir. 1996); *Hamilton,* 969 F.2d at 1011 ("when defendants make timely objections to joint representation, they need not show an actual conflict of interest when a trial court fails to inquire adequately into the basis of the objection."). We have stressed that the trial judge "has an ' "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." ' " *Cook,* 45 F.3d at 393 (quot-

ing *United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994) (quoting in turn *Wheat v. United States,* 486 U.S. 153, 161, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988))).

In *Holloway* three defendants were each charged with robbery and rape. The trial court appointed one public defender to represent all three defendants. Shortly thereafter the public defender moved for appointment of separate counsel for the three defendants because of the possibility of a conflict of interests. The motion was denied. Prior to the jury being empaneled, defense counsel renewed the motion for separate counsel, arguing "that one or two of the defendants may testify and if they do, then I will not be able to cross-examine them because I have received confidential information from them." 435 U.S. at 478, 98 S.Ct. at 1175. The trial court again denied the motion and trial began.

During the presentation of the defense, the public defender informed the court that despite contrary advice, all three defendants had decided to testify. Their testimony created a serious conflict of interests because the public defender could not cross-examine witnesses against his clients as those witnesses were also his clients. Despite this conflict, the trial court required the public defender to continue the joint representation and convictions followed, which the Arkansas Supreme Court upheld.

The Supreme Court reversed, holding that the failure of the trial judge "either to appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel . . . in the face of the representations made by counsel . . . deprived petitioners of the guarantee of 'assistance of counsel.'" 435 U.S. at 484, 98 S.Ct. at 1178–79. The Court relied on the longstanding principle laid down in *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942):

"Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect

the right of an accused to have the assistance of counsel. . . .

. . . .

"Of equal importance with the duty of the court to see that an accused has the assistance of counsel is *its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting, that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court.*" [*Glasser,*] 315 U.S., at 71, 76 [62 S.Ct., at 465, 467] (emphasis added).

435 U.S. at 484–85, 98 S.Ct. at 1173. The Court noted some of the specific dangers inherent in joint representation:

Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, in this case it may well have precluded defense counsel for Campbell from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable. Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of clients in order to minimize the culpability of one by emphasizing that of another. Examples can be readily multiplied. *The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters.*

. . .

435 U.S. at 490, 98 S.Ct. at 1181 (emphasis added).

2. We recognize that Selsor's trial occurred before the *Holloway* decision. However, the state conceded at oral argument that *Holloway* was based on *Glasser* and therefore it candidly admitted that it could not in good faith argue that Selsor was attempting to claim the benefit of a new rule. Moreover, *Selsor I* held that *Holloway* was the applicable legal standard and that decision is the law of the case. When a court decides

. In *Selsor I* we held that *Holloway* controls the instant case. We remanded for the federal habeas court to determine (1) whether Selsor's objection at trial to joint representation was timely, and if so, (2) whether the state trial judge took adequate steps to ascertain whether the risk of a conflict of interests was too remote to warrant separate counsel. 22 F.3d at 1033–34.[2] The federal habeas judge found that Selsor's objections were timely, but he rejected Selsor's arguments that the state judges committed constitutional error in requiring joint representation of Selsor and Dodson. We turn now to consider the correctness of the latter ruling below.

**B**

**The Application of *Holloway* Here**

On November 10, 1975, the state public defender, Richard Hoffman, filed a motion for severance on behalf of Selsor in which he asserted that the defenses of the two defendants were "separate and distinct," and that co-defendant Dodson "could attempt to implicate this Defendant [Selsor] in order to try and extricate himself from involvement." Plaintiff's Ex. 2 at ¶¶ 2 and 3. On January 14, 1976, Selsor filed a petition for pro se representation. Plaintiff's Ex. 3. In that petition, Selsor stated "I wish private counsel to be specially appointed in my behalf. Should this Court refuse this request, I wish to represent myself in any and all criminal charges pending against me." *Id.*

On January 15, 1976, Hoffman filed an affidavit stating that it was in Selsor's best interest that the motion for severance be zealously argued but that it was in Dodson's best interest that a motion for severance not be argued. Plaintiff's Ex. 4 at ¶¶ 1 and 2. He then represented that "the Tulsa County Public Defenders Office is, therefore, placed in the position of having to zealously repre-

on a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). There may be grounds for relaxing the application of the law of the case doctrine, *see,* e.g., *United States v. Platero,* 72 F.3d 806, 810–11 (10th Cir.1995), but no such grounds exist here. Therefore, we must follow the holding of *Selsor I.*

sent opposing points of view." *Id.* at ¶ 3. He noted that "there is a serious possibility that Richard Eugene Dodson take [sic] the witness stand in his own behalf and that testimony could be prejudice [sic] to Michael B. Selsor." *Id.* at ¶ 4.

A hearing was held on January 16, 1976 before a state district judge. At that hearing, Hoffman informed the court that Dodson would change his plea from not guilty to not guilty by reason of insanity. Plaintiff's Ex. 5 (transcript of 1/16/76 hearing) at 31. He noted that Dodson might testify, and if so, "the statements made by him could be extremely prejudicial to the defendant Michael Bascum Selsor." *Id.* Hoffman argued for severance, saying he felt that the public defender's office

> has been placed in a strange situation in that to ardently and zealously argue this [severance] motion on behalf of Mr. Selsor, we are in affect [sic] arguing against Mr. Dodson in some regard in that the evidence will tend to place Mr. Selsor in a like relation to Mr. Dodson whereby he should be severed where Mr. Dodson could perhaps benefit before a jury by the light that the evidence will place on the co-defendant Selsor.

*Id.* The motion was denied. *See* Appendix to this opinion (Excerpt of January 16, 1976 Hearing Transcript). This statement, along with previous submissions filed by counsel and Selsor, squarely placed the conflict of interests issue before the state judges.

On January 21, 1976, prior to jury selection, Mr. Corley, the other state public defender representing Selsor and Dodson, requested that outside counsel be appointed for one of the defendants, and again argued for severance:

> [T]he defense on behalf of defendant Dodson will be that of insanity—not guilty by reason of insanity. The defense of defendant Selsor will simply be not guilty. Now, what this will necessarily mean is that on behalf of defendant Dodson we must acknowledge presence at the scene of the crime and complicity in the crime and deny such on behalf of defendant Selsor. Now, that leaves us in the very awkward position of having to choose which one

we're going to defend, because if we claim insanity on behalf of the defendant Dodson and maintain that he was acting in a state of mind wherein he was incapable of determine [sic] right from wrong and partially from the insistence of the co-defendant, *we must with no reservation condemn the defendant Selsor.* If we defend the defendant Selsor and deny his guilt, then there is no way possible we can present the insanity defense on behalf of the defendant Dodson which leaves an interesting question; *how do we choose which one we are going to defend?*

State Trial Transcript at 3–4 (emphasis added). The state trial judge, a different judge than the one at the January 16 hearing, made no inquiry into the potential conflict. He told the two public defenders: "You and Mr. Hoffman can decide which one you want to particularly represent if you think that is necessary." *Id.* at 6. He noted the motion was the same one presented at the January 16 hearing and said: "As I reviewed the authority submitted to [the hearing judge] and the authorities he gathered and put in detail and as I concur in his rulings on your motion to sever, I will deny it also and give you an exception." *Id.* at 6–7. *See* Appendix to this opinion (Excerpt ·of Trial Transcript, January 21, 1976).

On January 22, 1976, prior to opening statements, public defender Corley again renewed the motion to sever:

> MR. CORLEY: I would like to renew our motion to sever on the ground that it now appears at this time that we will indeed be calling Dr. Garcia as a witness to present our defense of insanity on behalf of defendant Dodson and I don't see any way in the world we can, without any conflict, defend the defendant Selsor at the same time. I just don't see any way. It was suggested yesterday that this was merely a ploy to attempt to create reversable [sic] error. Now, goodness knows, that in this case, Your Honor knows the facts, that we need reversable [sic] error, there's *no* question about it, we don't deny that. I will state unequivocally that what we're doing is not intended to create any error, it's in good faith. As a matter of fact, at

one time we did debate or kick around the possibility of not seriously pursuing this so maybe there would be error, *but we decided we owed an obligation to our clients to vigorously defend them at trial as best we could and the only way we can do it was to move for a severance and split the cases because there was no way we could consistently defend both of them at the same time.* It is in good faith and we will be willing to swear under oath to that affect [sic]. In fact, Your Honor suggested that one of us take one client and one take the other. I want to make our understanding of the situation perfectly clear for the record. Mr. Hoffman, as Your Honor can tell, is now doing most of the trying of the case and I am assisting him. I consider myself primarily more in the advisory capacity than anything else. Mr. Hoffman has tried only one jury case, I've tried probably twenty-five or thirty and for this reason I am assisting him.

BY THE COURT: Mr. Corley, I do not want to listen to you say you are not prepared.

MR. CORLEY: I didn't say I wasn't prepared, Your Honor.

BY THE COURT: I'll not listen to that. I don't want to hear that.

MR. CORLEY: *I say this because I don't see how we can professionally consistently under the Cannon [sic] of Ethics one take one and one take the other because I must assist him with both of them. This means that if I defend one I must at the same time advise him with regard to the person of the adversary [sic] position. I can't do it consistent with the Cannon [sic] of Ethics.*

BY THE COURT: The motion will be overruled as I stated yesterday.

State Tr. at 152–54 (emphasis added). Selsor and Dodson then proceeded to trial, both represented by public defenders Hoffman and Corley.

The defense moved for severance three more times during the trial—on January 22, during the testimony of Officer Evans, State Tr. at 276; on January 23, at the close of the state's case-in-chief, *id.* at 380; and finally again on January 23 at the close of the

defense case, *id.* at 394. All of these motions were denied.

It is clear that the issue of a potential conflict of interest resulting from the joint representation was repeatedly brought home to both the state judge at the pretrial hearing and the state trial judge. Because the state does not challenge the federal habeas judge's conclusion that there was a timely objection to the joint representation, our inquiry addresses only whether the state court judges took adequate steps to ascertain whether the risk of conflict of interest was too remote to warrant separate counsel. *Holloway,* 435 U.S. at 484, 98 S.Ct. at 1178. The federal district judge concluded that there was an adequate inquiry and denied Selsor's habeas petition. We must disagree.

In *United States ex rel. Zembowski v. DeRobertis,* 771 F.2d 1057 (7th Cir.1985), the Seventh Circuit affirmed a grant of habeas relief to a petitioner who, like Selsor, was represented by the same counsel as his codefendant at their joint trial:

> When presented with [counsel's] claim of conflicting defenses, at a minimum the trial court should have requested that [counsel] give him some idea of what the conflict entailed, to allow him to determine whether to order [counsel] to withdraw.... *Holloway* does not require that [counsel] disclose his trial strategy or violate his duty of confidentiality to his clients, so that the substance of what he disclosed may have been quite limited. *Still the judge had an obligation to determine whether the conflicting defenses encompassed more than the evidence incriminating [codefendant] Thomas, and if so whether the possibility of an actual conflict's developing mandated the court's ordering [counsel] to withdraw from joint representation....*

*Id.* at 1063 (emphasis added).

In *Smith v. Anderson,* 689 F.2d 59, 63 (6th Cir.1982), the Sixth Circuit held that "[i]n the realm of the Sixth Amendment, when an objection to joint representation is properly raised *and dismissed without a searching review, which can demonstrate that counsel's fear for his effectiveness is groundless, a*

constitutional violation occurs." (Emphasis added.) The court further stated that

> Flowing naturally from these elemental principles are the holdings of *Holloway v. Arkansas* and *Glasser v. United States* that counsel simply may not be required by the court to undertake joint representation *without a convincing showing that counsel's protestations that such multiple representation is fraught with potential conflicts of interest are groundless.*

*Id.* (emphasis added).

 In making an inquiry into potential conflicts, the trial judge must bear in mind that "[a]n 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of trial.'" *Holloway*, 435 U.S. at 485, 98 S.Ct. at 1179 (quoting *State v. Davis*, 110 Ariz. 29, 514 P.2d 1025, 1027 (1973)). In addition, "attorneys are officers of the court, and 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.'" *Id.* at 486, 98 S.Ct. at 1179 (quoting *State v. Brazile*, 226 La. 254, 75 So.2d 856, 860–61 (1954)). Thus the trial court can require counsel who has raised the objection to joint representation to continue such representation only if, after a searching inquiry, it is clear that counsel's claim of conflict of interest is "groundless."

 We find instructive *Hamilton v. Ford, supra,* cited by Selsor. The petitioner there, like Selsor, was tried jointly with his codefendant, was jointly represented, and timely objected to joint representation. The Eleventh Circuit granted a conditional writ,

holding that the state trial judge's inquiry was inadequate:

> We also find that the trial court inadequately inquired into the possibility of a conflict of interest. The court's inquiry consisted solely of commenting in a colloquy during the first day of trial that it doubted that defense counsel wished to elaborate how there was a conflict of interest. Defense counsel did not respond because the comment was made in open court. The court then stated that it had read the trial file in relation to an unrelated motion and did not see how a conflict of interest could arise. No further inquiry was made.
>
> We find that the reading of a file for an unrelated purpose is inadequate exploration of the possibility of conflict. Further, by asking defense counsel to disclose trial strategy in open court, the trial court improperly placed counsel in a situation where in order to adequately respond he would have had to disclose client confidences, thereby breaching attorney/client confidentiality. As the Supreme Court stated in *Holloway*, "[O]ur holding [does not] preclude a trial court from exploring the adequacy of the basis of defense counsel's representations regarding a conflict of interest without improperly requiring disclosure of the confidential communications of the client." 435 U.S. at 487, 98 S.Ct. at 1179.

969 F.2d at 1013. *Hamilton* concluded that an adequate inquiry must be targeted at the conflict issue and that the inquiry must be searching, without improperly requiring defense counsel to disclose confidential communications. We agree.[3]

---

3. The state relies on several cases where courts have rejected defendants' arguments that severance was required because their defenses were incompatible with those of their codefendants. *See United States v. Brown*, 784 F.2d 1033 (10th Cir.1986); *United States v. Swingler*, 758 F.2d 477 (10th Cir.1985); *United States v. Lee*, 744 F.2d 1124 (5th Cir.1984). They are distinguishable because they do not involve joint representation. *Milton v. Morris*, 767 F.2d 1443 (9th Cir. 1985), and *United States v. Lee*, 589 F.2d 980 (9th Cir.), *cert. denied*, 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979), both conflict of interest cases cited by the state, are also distinguishable

because they did not involve joint representation problems.

Although *Stringer v. Jackson*, 862 F.2d 1108 (5th Cir.1988), *vacated on other grounds sub nom. Stringer v. Black*, 494 U.S. 1074, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), also relied upon by the state, was a case of joint representation, it is distinguishable on two grounds: (1) in *Stringer* the defendants were tried separately, and (2) *Stringer*, unlike Selsor, failed to object at trial to the joint representation and therefore fell under the more stringent standard of *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), rather than the *Holloway* standard. *Cuyler* requires a defendant to demonstrate "an

**1502**

The federal habeas judge here found *Hamilton* distinguishable. He said that in Selsor's case "[t]he trial court engaged in an extensive discussion of the possibility of a conflict of interest regarding Petitioner's representation with counsel for both the prosecution and the defense." Order of November 10, 1994 at 2. We disagree. Our review of the record convinces us that neither of the state court judges made an adequate inquiry as required by *Holloway.* The first state judge recognized that the confessions by the codefendants raised an issue under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968),[4] but he concluded that *Bruton* did not apply. His *Bruton* inquiry, however, did not address the possibility of a conflict of interest resulting from the joint representation. Thus the judge's inquiry into the possibility of a conflict of interest

was inadequate. *See* Appendix to this opinion.

Selsor argues that "the [state] court failed to consider the *conflicting defenses* counsel would present at trial." Appellant's Brief at 14. We agree. The state court treated the joint representation problem "as an internal problem for the Public Defender's office." Plaintiff's Ex. 5 at 38.[5] There was no inquiry into how Selsor's defense might be adversely affected by the joint representation even though the potential conflict of interest was patent. As defense counsel noted, Dodson would assert an insanity defense which required him to admit his role in the offenses, including his participation with Selsor. Selsor's defense was to deny any involvement. These inconsistent positions could color the judgment of the defense attorneys throughout the trial.[6] An adequate consideration of

---

actual conflict existed by pointing to specific instances in the record which reflect that [counsel's] performance in his behalf was adversely affected." *Stringer,* 862 F.2d at 1117 (citing *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718).

**4.** "*Bruton* holds that the sixth amendment rights of a defendant are violated if the defendant's nontestifying codefendant makes a confession that implicates the defendant and the Government introduces the confession into evidence at their joint trial." *United States v. Hill,* 901 F.2d 880, 883 (10th Cir.1990).

**5.** We do not sit in supervision of state court enforcement of attorney ethical standards. *See Fero v. Kerby,* 39 F.3d 1462, 1480 (10th Cir.1994) ("federal courts hold no supervisory power over state judicial proceedings"), *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 2278, 132 L.Ed.2d 282 (1995); *cf. Gallegos,* 39 F.3d at 279 ("a violation of [state ethical] rules will not in itself constitute a constitutional violation under *Cuyler* and related cases."); *English v. United States,* 620 F.2d 150, 151 n. 3 (7th Cir.) (noting that attorney's representation of multiple defendants may have violated ethical rule but that such violation did not establish a constitutional violation), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980). However, we note that the state judge's assertion that the representation of Selsor and Dodson was an internal ·problem of the public defender's office might have been at odds with the Oklahoma ethical standards then in effect.

At the time of Selsor's trial, attorneys practicing in Oklahoma state courts were bound by the American Bar Association Code of Professional Responsibility as adopted in Oklahoma. *See* 5 O.S.1971, Ch. 1, App. 3. DR 5–105(B) provided "[a] lawyer shall not continue multiple employment if the exercise of his independent profes-

sional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another...." DR 5–105(D) provided "[i]f a lawyer is required to decline employment or to withdraw from employment under DR 5–105, *no partner or associate of his or his firm may accept or continue such employment.*" (Emphasis added.)

These provisions appear to have ethically prohibited the Tulsa public defenders office from representing both Selsor and Dodson. *See also* ABA Comm. on Professional Responsibility, Informal Op. 1418 (1978) (representing clients with conflict of interest by the same public defender department) (under DR 5–105(D), "if one [public defender] handling one defendant is disqualified from handling both defendants, the Department is disqualified from accepting both."). *Cf. United States v. McCullah,* 76 F.3d 1087, 1099 (10th Cir.1996) (no Sixth Amendment violation because of a conflict of interest where a prospective government witness was represented by the same federal public defender office as that of the public defenders who represented defendant; witness did not testify, so conflict never materialized, and defendant "was represented by attorneys in the same federal public defender office, not by the same attorney as [the prospective witness]."). In any event, as previously noted, *both* public defenders here represented *both* Selsor and Dodson at the trial, rather than each attorney representing one of the defendants, and the state judge required that dual representation to continue over the repeated objections for Selsor.

**6.** Our record suggests several points of potential conflict between the interests of Selsor and Dodson which should have been perceived by the state court judges: (1) if Dodson testified, Sel-

the conflict would have revealed the impossibility of going forward with the joint representation. Yet the state judge "turn[ed] a blind eye to an obvious possible conflict," *Cook*, 45 F.3d at 394 (quoting *Levy*, 25 F.3d at 154), and required the continued joint representation. We are persuaded that the state judge failed to fulfill his constitutional duty by "insisting ... that counsel undertake to represent interests which might diverge from those of his first client, when the possibility of that divergence [was] brought home to the court." *Glasser*, 315 U.S. at 76, 62 S.Ct. at 467.

As noted, the conflict of interest issue was raised again on January 21, 1976 before the trial judge, a different state judge. Selsor argues that the trial judge "made no individual findings regarding the possibility of a conflict of interest, relying on [the] previous ruling." Appellant's Brief at 15. We agree. The state trial judge's questions focused only on the timing of Dodson's change of plea and he simply agreed with the first judge's ruling at the January 16 hearing. *See* Appendix to this opinion. Thus both state judges "turned a blind eye" to the obvious possibility of a conflict of interest. *Cook*, 45 F.3d at 394. We hold that neither inquiry was adequate under *Holloway*.

The state asserts that "[t]he issue of the propriety of the [state] trial court's finding [on the conflict of interests] is not squarely before this Court on appeal." Appellee's Brief at 7. We disagree. The inquiry required surely encompasses a sound resolution of the conflict problem. We must reject the narrow reasoning of the state judge, which the federal habeas judge followed.[7] Otherwise the inquiry mandated by *Holloway* would be an empty ritual. As the Sixth Circuit held in *Smith v. Anderson, supra,* the

inquiry is the mandatory procedure for deciding whether counsel's claim of conflict is "groundless." 689 F.2d at 63. In fact, in *Hernandez v. Mondragon*, 824 F.2d 825, 826–27 (10th Cir.1987), before we affirmed the denial of habeas relief we held that the inquiry requirement of *Holloway* was followed, *and* that the conclusions reached by the federal district court, including a conclusion that there was no conflict of interest, were correct.

Our review of the record convinces us that the state court judges did not "take adequate steps to ascertain whether the risk [of conflict] was too remote to warrant separate counsel." *Holloway*, 435 U.S. at 484, 98 S.Ct. at 1178. Defense counsel's conflict claims were clearly not "groundless" and should not have been rejected. Since the state court failed to discharge its constitutional duty, conditional habeas relief must be granted. *Cook*, 45 F.3d at 393; *Hamilton*, 969 F.2d at 1011.

## C

### The Showing Required of Petitioner Selsor

We have rejected above the State's argument that there was an adequate inquiry under *Holloway* concerning the conflict of interests claimed in the instant case. There is an additional argument made by the State that the showing by Selsor here failed to demonstrate an actual conflict of interest adversely affecting his lawyer's performance. Appellee's Brief at 12. The State relies on *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), and *Hernandez v. Mondragon*, 824 F.2d at 825–27.

---

sor's interest would indicate aggressive cross-examination; (2) Selsor's interest would be served by an independent decision whether he should testify, unencumbered by the possible impact of his testimony on Dodson; (3) Selsor's interest would perhaps be served by vigorous argument for severance, unencumbered by Dodson's interest in opposing severance; and (4) Selsor's ability to pursue a plea agreement may have been stronger had Selsor been able to operate independently of Dodson, *see Holloway v. Arkansas*, 435 U.S. at 490, 98 S.Ct. at 1181.

7. The federal habeas judge held below:

The Court finds that the trial court made adequate inquiry into the possibility of conflict. The Court does not explore the soundness of result reached in the trial court's "adequate inquiry" under *Holloway*, but only the adequacy of the inquiry. The trial court's adequate inquiry negated the presumption of ineffective assistance of counsel that would otherwise exist in the face of Petitioner's timely objection to joint representation.
I R. doc. 29 at 3.

■ In *Selsor I* we addressed the requirement of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for a showing of actual conflict. In *Selsor I* we concluded that

> *Strickland's* requirement of a showing of actual conflict presupposes that trial courts conduct an appropriate inquiry when the defendant properly raises the [conflict of interest] issue. *Holloway,* however, addresses the situation where the trial court *fails* to make such an inquiry in the face of the defendant's timely objection. As a result, the *Strickland* rule requiring a defendant to demonstrate an actual conflict of interest in order to obtain a presumption of prejudice is inapplicable to a *Holloway*-type case. *We therefore conclude the holding in Holloway—i.e., that prejudice is presumed when the trial court fails to either appoint separate counsel or make an adequate inquiry, in the face of the defendant's timely objection—satisfies Strickland's prejudice requirement without a showing of actual conflict.*

22 F.3d at 1033 (second emphasis added). Thus, it is the law of this circuit, and the law of the case in this controversy, that in this *Holloway*-situation, the defendant did not need to show actual conflict. That was decided in *Selsor I.* And since there is no justification shown for relaxing the law of the case, we will follow the holding of *Selsor I,* noted above. Thus, prejudice is presumed [8] with respect to Selsor because the state trial court failed to appoint separate counsel and, as we now hold in this opinion, the state judge also failed to make an adequate inquiry, despite the defendant's timely objection to representation of both defendants by attorneys Corley and Hoffman.

■ Moreover, our holding that conditional habeas relief must be granted in Selsor's case need not depend on a presumed conflict of interest because here the record demonstrates an actual conflict that adversely affected the performance of Selsor's counsel. In *United States v. Bowie,* 892 F.2d 1494, 1500 (10th Cir.1990), we said

> "Actual conflict" and "adverse effect" are not self-defining phrases, [citations omitted], but in the context of the instant case, *we hold that defense counsel's performance was adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests.*

*Id.* at 1500 (emphasis added). Under this standard, it is clear that here defense counsel's performance was adversely affected by his duties to codefendant Dodson.

The state asserts that

> there is no evidence in the record that one defendant had evidence that would exculpate himself and inculpate his co-defendant. Each defendant alone confessed, implicating himself. The confession of each would have been admissible even if separate trials were given and separate counsel was appointed....

> ....

> There is nothing in the record to show that counsel would have acted any differently if he only represented one defendant other than possibly placing each defendant on the stand. However, the confessions of each would have still been admissible.... In light of the above authority, the Appellant has failed to show that an actual con-

---

8. In *Holloway,* the Court emphasized the holding of *Glasser,* 315 U.S. at 75–76, 62 S.Ct. at 467–68, that

> "To determine the precise degree of prejudice sustained by Glasser as a result of the [district] court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial...." *But from the cases cited it is clear*

that the prejudice is presumed regardless of whether it was independently shown. *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), for example, stands for the principle that "[a] conviction must be reversed if [the asserted trial error occurred], *even if no particular prejudice is shown and even if the defendant was clearly guilty." Chapman v. California,* 386 U.S. 18, 43, 87 S.Ct. 824, 837, 17 L.Ed.2d 705 (1967) (Stewart, J., concurring); see also *id.,* at 23, and n. 8, 87 S.Ct. at 827 and n. 8 (opinion of the Court).
435 U.S. at 488–89, 98 S.Ct. at 1181.

flict existed and similarly the record fails to show that an actual conflict existed and the trial court properly did not appoint separate counsel.

Appellee's Brief at 13–14. We disagree with the state's argument that the record does not show an actual conflict.

The record reveals that defense counsel's cross-examination of Officer Evans was damaging to Selsor. During that examination, the following exchange occurred:

Q Now, you previously stated that there was some conversation between the two defendants prior to entering the U–TOTE–M store concerning taking them out, is that correct?

A That's correct.

Q Do you remember who said to whom—can you tell the jury something more about that conversation, if you recall?

. . . .

A I had asked Mr. Dodson if there had been any plans of this previous to going in the store and he stated that Mr. Selsor had mentioned taking them out, but he didn't believe he was for real and Mr. Selsor's *comment on that was that, We discussed it and we didn't want to leave any witnesses behind and I only did my part.*

Q It's your testimony that their statements were different in that regard?

A Not that much. It was the same to me.

Q Okay. So, it was Mr. Dodson who said something to the affect [sic] that he didn't believe Mr. Selsor was serious in that regard.

A He stated that after he had mentioned that they had discussed taking them out, he said that he didn't believe he was for real.

Q Okay. Did he tell you concerning that evening in your interview with him, did Mr. Dodson state that he and Mr. Selsor were different and that kind of thing was not his way of doing things?

A I don't recall that.

. . . .

Q Officer, at the time when you asked Mr. Dodson if he had shot the girl after hearing the firing in the background to his rear, you did ask him if he shot the girl, is that correct?

A Yes.

Q And, did he give any indication of his mental condition at that time?

A He stated that when he heard the other shot that he had freaked out, stepped back, pointed the gun and fired it five or six times.

Q Did he express intention to wound the individual in the cooler?

A Just that he had pointed it in the direction of the female behind the glass.

Q Did he say that he didn't intend to hit her? Did he say, I didn't try to hit her?

A He may have said that, yes.

Q Did he say, I did not intend to hit her through, I just shot through?

A He said, I didn't try to hit her, I just shot through.

State Tr. at 313–16 (emphasis added).

It is clear from this exchange that defense counsel was attempting to show that Dodson did not intend to "take out the witnesses" or to shoot Morris. This line of questioning was in keeping with counsel's duties to Dodson. However, this drove counsel into an actual conflict by creating the appearance that Selsor was more culpable than Dodson. Counsel's line of questioning elicited Dodson's statement that Selsor had said: "we didn't want to leave any witnesses behind and I only did my part." This was a foreseeable result of defense counsel's inquiry in this area.

Defense counsel's question "did Mr. Dodson state that he and Mr. Selsor were different and that kind of thing was not his way of doing things?" was an attempt to show that Dodson did not intend to "take out" the witnesses, but that Selsor did intend to do so. The damaging effect is obvious—no conflict-free counsel would have asked that question on behalf of Selsor.[9]

9. We must note that during direct examination, Officer Evans testified that both Dodson and

Selsor told him that they had planned to kill the witnesses. State Tr. at 278, 283. Thus, Selsor's

We hold that there was an actual conflict of interest that adversely affected counsel's performance on behalf of Selsor. Therefore, we are convinced that this record shows violations of Selsor's Sixth and Fourteenth Amendment rights to effective assistance of counsel.

## IV

### CONCLUSION

Under the Sixth and Fourteenth Amendment principles laid down by the Supreme Court, we hold that Selsor's convictions are constitutionally invalid and cannot stand.

Accordingly, the denial of habeas relief is **REVERSED.** Selsor's convictions are adjudged constitutionally invalid under the Sixth and Fourteenth Amendments. The case is **REMANDED** to the District Court for the Northern District of Oklahoma with directions to enter judgment invalidating Selsor's convictions in accordance with this opinion, but providing that such judgment is without prejudice to further proceedings by the state for retrial of the petitioner within a reasonable time. If such a retrial results in valid convictions and sentences, the federal habeas proceedings shall be dismissed; if, however, the state does not conduct a new trial within a reasonable time, as determined by the habeas court below, then the writ shall issue.

### APPENDIX

### Excerpt of Transcript of Hearing, January 16, 1976

BY THE COURT: .... Now, the next proposition of concern is the fact that the defenses are separate and distinct, paragraph two [of the motion to sever], a danger exists that this co-defendant would attempt

to implicate this defendant in order to try to extricate himself from the involvement for the said co-defendant in the above styled cases of previous felony convictions. *You have not made any remarks [?] for the balance of your statements and the motion for severance [?]....*[10]

....

... I see nothing in the balance aside from the very serious Bruton problem which I find would not be applicable in this case that would require a severance motion. *The problem of individual representation for each of these defendants, I think, is an internal problem for the Public Defender's office.* Unless something of the nature of the Fugett case that counsel has cited [*Fugett v. State*, 461 P.2d 1002 (Okla.Crim.App.1969) ] would arise and that, of course, was a situation, I think, that as I recall the case, did involve a problem of one of the defendants taking the stand and did involve the Bruton rule. Again, I think that with a multiple personnel Public Defender's office we can affectively [sic] represent, have representation of these defendants where we don't have a group problem.

MR. HOFFMAN: Your Honor, might I note for the record that the defendant has formally executed an affidavit firing the [?] Public Defender's office.

BY THE COURT: Now, that's the next step. The next step [?] is your application to have private counsel appointed. I [?] think we need to get over that hurdle before we see whether this defendant is entitled to have self representation, whether he still desires to have that in light of the ruling here. So, at this time, I would overrule the motion for severance, deny the application because I don't think the facts under Fugett would require private counsel hiring, would be ap-

---

statement that they planned to kill witnesses was already before the jury. However, defense counsel's attempt to diminish Dodson's culpability vis-a-vis Selsor served to emphasize Selsor's culpability and thereby aid the prosecution case against Selsor. We cannot, of course, measure the prejudicial effect to Selsor of defense counsel's cross-examination of Officer Evans, but we believe it important to note that the prosecution in its closing arguments relied heavily on the defendants' statements about "taking out" wit-

nesses. *See* State Tr. at 400, 408, 414, 416. Because Dodson was acquitted of murder and Selsor was convicted, there is at least an indication that defense counsel's conduct may have helped convict Selsor.

**10.** The question marks signify portions of this hearing transcript which are unclear or illegible. This transcript seems to have been taken off of microfilm and the quality is poor in places.

plicable in this case and then I suggest that maybe you have a conference with your defendant Mr. Selsor on seeing whether he would like to re-urge his Pro se application under the Supreme Court ruling.

MR. HOFFMAN: Might I note for the Court, Your Honor, that previously, I believe it was last week, I confronted Your Honor with this problem we had in regard to it being an internal problem with the Public Defender's office. Mr. Selsor was provided with an alternative counsel from the Public Defender's office in that Pete Silva, a member of our office, was assigned by Les Earl, the Chief Public Defender to represent Michael Selsor in this case and Mr. Selsor refused his assistance at that time.

BY THE COURT: All right. You all have had an opportunity to visit with Mr. Selsor and see if he wants to be heard personally on his motion for representation. As far as [?] I'm concerned you're still representing him. At this time I [?] have not granted an application to withdraw. If you want a minute [?] or two to visit with him, I'll let you do that. That will [?] leave the remaining application of his Pro se representation to be ruled upon....

. . . .

BY THE COURT: We had pending the last petition of the defendant in this case, the petition for Pro se representation in the event he was disallowed the opportunity to have private counsel under the Fugett decision and disallowed a severance. Is there an announcement?

MR. HOFFMAN: Your Honor, at this time the defendant would withdraw his application for Pro se representation and continue having representation with the Public Defender's office. *I might state on behalf of the Public Defender's office that we would still allege the position that this provides us with an inexorable conflict in that we have to provide separate and distinct defenses for these defendants in contradiction to each other in the one proceeding.*

BY THE COURT: At this time then with the record reflecting counsel has been present throughout these proceedings as initially indicated, Mr. Selsor's presence throughout these proceedings, we will allow the withdrawal of [?] Pro se representation application by the petitioner [?] announcement of counsel of record. We will indicate [?] the trial is originally set for this coming Monday....

Plaintiff's Ex. 5 (Transcript of Hearing on January 16, 1976) at 36–41 (emphasis added).

### Excerpt of Trial Transcript, January 21, 1976

MR. CORLEY: We filed on the 10th day of November, 1975 a motion for severance on behalf of defendant Michael Selsor. I believe we have also requested that outside counsel be appointed for either one of these defendants. *We would again re-urge our motion for severance on behalf of each defendant orally at this time, if we may, Your Honor, for this reason, the defense on behalf of defendant Dodson will be that of insanity—not guilty by reason of insanity. The defense of defendant Selsor will simply be not guilty. Now, what this will necessarily mean is that on behalf of defendant Dodson we must acknowledge presence at the scene of the crime and complicity in the crime and deny such on behalf of defendant Selsor.* Now, that leaves us in the very awkward position of having to choose which one we're going to defend, because if we claim insanity on behalf of the defendant Dodson and maintain that he was acting in a state of mind wherein he was incapable of determine right from wrong and partially from the insistence of the co-defendant, *we must with no reservation condemn the defendant Selsor.* If we defend the defendant Selsor and deny his guilt, then there is no way possible we can present the insanity defense on behalf of the defendant Dodson which leaves an interesting question; *how do we choose which one we are going to defend?* Do we flip a coin, do we have some kind of a contest between the two, do we let them engage in a tug of war, what do we do, which one are we going to defend? We're very serious and we filed a motion to withdraw from one of these cases. To me, Your Honor, it's a classic case of a conflict in this case and I don't see any possible way. *If your Honor forces us to defend both of them, we really haven't decid-*

ed at this time which one we're going to vigorously defend and which one we're not going to defend. I just don't see any way we can reconcile the two.

BY THE COURT: These crimes were alleged to have been committed in September. When were you appointed to defend these defendants?

MR. CORLEY: The record should reflect that, Your Honor, it was immediately upon their first appearance in court.

BY THE COURT: They were ordered held for trial by the Magistrate at the preliminary on the 14th of October, 1975. I believe these cases have been set for trial before, have they not?

MR. CORLEY: I don't believe they have, Your Honor. We filed a motion on the 10th of November, 1975. It's not a new motion.

. . . .

BY THE COURT: Do I understand correctly, Mr. Corley, that the plea was entered on behalf of the defendant Dodson heretofore was not guilty period?

MR. CORLEY: That's correct, Your Honor. It's his choice at this time to enter a plea before the jury trial of not guilty by reason of insanity.

BY THE COURT: Well, I understand that pleas are to be entered at the time of arraignment and not at the time of trial for the very good reason that it would prevent the situation that you say you find yourself in. It's been set for trial.

MR. CORLEY: Your Honor, I believe that we were not able to send them to Eastern State Hospital until after the District Court arraignment. It was not until after that time that this became obvious to us.

BY THE COURT: Both you and Mr. Hoffman have been in the case from the beginning, is that correct?

MR. CORLEY: Yes, we were both present at the preliminary hearing, yes, sir. We have represented both defendants, Mr. Hoffman primarily is representing the defendants and I am appearing to assist him in whatever assistance I can give him based on the fact that I have a little more experience than he does, assist him in making the record also.

BY THE COURT: I understood they were your cases from what he told you last week.

MR. CORLEY: As far as our office records were concerned they are assigned to Judge Ricketts and as Your Honor knows I am assigned to Judge Ricketts' court so any case assigned there would be mine. We talked about this, I believe, before the preliminary hearing and he agreed to try the cases on the condition that I would assist him and be with him at all times.

BY THE COURT: I don't know if I have a copy of those motions you are looking at. May I see them? *Mr. Corley, your motion to withdraw will be denied and give you an exception. You and Mr. Hoffman can decide which one you want to particularly represent if you think that is necessary. You also have a motion to sever and this is the same motion which was argued before Judge Ricketts.*

MR. CORLEY: Yes, sir.

BY THE COURT: As I reviewed the authority submitted to him and the authorities he gathered and put in detail and *as I concur in his rulings on your motion to sever, I will deny it also and give you an exception.* State Trial Transcript at 3–7 (emphasis added).