**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 30 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plainiff-Appellant,

v.

TRACY PROWS,

      Defendant-Appellee.

No. 95-4163

---

**Appeal from the United States District Court**
**for the District of Utah, Central Division**
**(D.C. No. 95-CV-388J)**
**(No. 91-CR-49J)**

---

Richard D. McKelvie, Assistant United States Attorney, Salt Lake City, Utah (Scott M. Matheson, Jr., United States Attorney, Salt Lake City, Utah, with him on the brief), for Plaintiff-Appellant.

Craig S. Cook, Salt Lake City, Utah, for Defendant-Appellee.

---

Before **TACHA, BALDOCK** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      Tracy Prows was convicted of mail fraud and wire fraud for his role in a scheme to obtain software from WordPerfect at discounted prices by

misrepresenting the identity of the purchaser. After an unsuccessful appeal,[1] Prows collaterally attacked his conviction under 28 U.S.C. § 2255, claiming that he had received ineffective assistance of counsel. The district court agreed and vacated the judgment. However, the district court misconstrued what is required for a conviction under the mail fraud and wire fraud statutes, 28 U.S.C. §§ 3141, 3143, and as a result misapplied the prejudice prong of the Strickland test. Under a correct construction of those statutes, we find that Prows was not prejudiced by his counsel's performance. Therefore, we reverse.

Background

Petitioner-Appellee Tracy Prows was the owner of Computerland of Ogden, a retail computer store in Utah. In mid-May of 1988, he was approached by James Baker who wanted to buy large quantities of WordPerfect software at a discount and resell them. Prows was an authorized WordPerfect dealer. He told Baker that discount prices were available when the software was purchased under a site license.

A site license is an agreement whereby WordPerfect sells a large number of programs at a discount to a buyer who agrees that the programs will be exclusively for its own use and will not be resold. The discounts available under

---

[1]United States v. Prows, 51 F.3d 287, 1995 WL 143433 (Table) (10th Cir. 1995) (unpub.).

a site license are substantial. For example, at a time when the lowest wholesale price available to a WordPerfect dealer was $198 per unit of software, the same programs could be purchased under a site license for $100 per unit. A dealer who refers a site license customer to WordPerfect receives a 20% commission on each unit sold under the license.

After speaking with Baker, Prows contacted a sales representative at WordPerfect and indicated that he had a customer, E.R.A. Realty, who was interested in obtaining a site license to purchase 5,000 units of software. At about the same time, Baker and another computer sales representative, Richard Hirsch, contacted buyers in the retail and wholesale trade, offering large blocks of WordPerfect for $145 a copy. One of the wholesalers contacted was Softsell Company in Englewood, California.

When Mark Wong, purchasing manager for Softsell, was approached, he became concerned that lower prices were available on the market than directly from WordPerfect. Wong contacted Clive Winn, a vice-president of WordPerfect, about the price discounting. Winn, in turn, began an internal investigation at WordPerfect. He initially suspected that a shipment of software had been stolen or that the merchandise was counterfeit. However, during the investigation, the E.R.A. Realty site license caught his attention because it was for the same quantity of software that had been offered to Softsell.

Winn, a former Federal Bureau of Investigation (FBI) agent, contacted local FBI agents and together they set up a sting. As a first step, they asked Softsell to increase its order to confirm that the source was the site license obtained by Prows. Wong contacted Baker and increased Softsell's order. Thereafter, WordPerfect received an order for 11,000 units to be purchased under the site license. The order indicated that the customer was National Insurance Services Company (NISC), rather than E.R.A. Realty. When a WordPerfect employee asked Prows who NISC was, Prows said that the company was an affiliate of E.R.A.

NISC was a fictitious entity created by Baker solely for the purpose of entering into the site license. Baker assumed the name of Tom Wohlschlaeger (the name of his deceased father-in-law) as the purchasing agent for NISC. He asked Colorado resident David Morrissey for help in furthering the scheme. Morrissey agreed to allow his Colorado phone number and address to be listed as the business phone number and address of NISC. He also agreed to answer the phone in a manner that would lead a caller to believe that he or she had reached the offices of NISC. When a call came in from WordPerfect for Tom Wohlschlaeger, Morrissey would take a message and forward it to Baker.

Using his word processor, Baker created a purchase order on NISC letterhead, authorizing the purchase of 11,000 units of WordPerfect software.

After receiving the order, WordPerfect mailed a site license to Prows. Baker signed the license as Tom Wohlschlaeger, purchasing agent for NISC. The license was then returned to WordPerfect.

On June 17, 1988, WordPerfect made a partial delivery of software to Prows at a loading dock in Ogden, Utah. Baker and Prows met the shipment. Winn and FBI agent John Nelson also were at the loading dock, posing as representatives of a trucking company that was to transfer the shipment to Softsell. Prows instructed Nelson and Winn that WordPerfect could not know about the reshipment to Softsell.

As payment for the software, Winn gave Prows a check for $870,000, purportedly from Softsell. The check, which had been manufactured by the FBI, was made out to Computerland. After Prows accepted the check, several more FBI agents appeared. Prows and Baker were subsequently questioned by the FBI.

A Grand Jury returned an indictment against Baker, Prows, and Morrissey, charging mail fraud, wire fraud, and aiding and abetting, pursuant to 18 U.S.C. §§ 1341, 1343, and 2. Baker pled guilty to all counts of the indictment and agreed to testify against Prows and Morrissey at the trial.

**The Trial**

The government's theory at trial was that Prows knew of the scheme to defraud and that he intended by his actions to further the scheme. The case was supported by the testimony of numerous witnesses, and in some cases, by Prows' own testimony. Prows, on the other hand, maintained that he believed that NISC was a real company, although he admitted that he knew that some of the computer software ordered under the site license would be sold to companies other than NISC. He also testified that he did not intend to defraud WordPerfect and that "sideways deals" were common in the computer industry.

The Prosecution's Case

Baker's testimony supported the government's theory that he and Prows planned the scheme together. Baker testified that Prows knew all of the following: that Richard Hirsch was soliciting buyers for the computers; that Baker was paying someone $10,000 to answer a phone in Denver as if it were the office of an insurance company; and that Baker had signed the NISC purchase order. Baker testified that it was Prows who arranged with WordPerfect to ship the goods to Computerland so that they could be reshipped to other buyers. He also testified that the profits from the venture, including profits from the resale of the computers and the commission from the site license, were to be divided between himself and Prows.

FBI agent John Nelson testified that during questioning Prows admitted: that he had realized that NISC was a nonexistent company and that Wohlschlaeger was not a real person; that Baker had made phone calls from Prows' office to find buyers for the software; that profits from the scheme were to be split three ways among Baker, Prows, and Hirsch. Nelson also testified that at the loading dock, when he handed Prows the check purportedly from Softsell, Prows said that WordPerfect could not know anything about the sale. He said that Prows' reaction to receiving the check was to remark that it was too large.

WordPerfect Vice President Winn testified that he had told Prows that he had spoken to Tom Wohlschlaeger who had confirmed the NISC order, and that Prows then requested that WordPerfect ship the software to Computerland for delivery to NISC's insurance agents around the country. Like Agent Nelson, Winn testified that Prows commented that the check from Softsell was in the wrong amount and that WordPerfect could not know anything about the check.

Karen Fossum-Zumkowski, a marketing assistant at WordPerfect, testified that Prows contacted her about arranging a site license under which E.R.A. Realty would purchase 5,000 units of WordPerfect software. She said that Prows arranged for the software to be sent to Computerland for redistribution to E.R.A. Zumkowski testified that she told Prows that she could not ship the product to Computerland without authorization on company letterhead from the customer.

The next day she received a purchase order on NISC letterhead for 11,000 units, authorizing delivery to Computerland. Zumkowski telephoned Prows to ask about the increase in the number of units and the change in buyer from E.R.A. to NISC. She said that Prows told her that NISC was an affiliate of E.R.A. Realty. According to Zumkowski, Prows urged her to send the site license agreement immediately because the customer would be vacationing in Utah and would be available to sign it. Zumkowski mailed the license to Prows by overnight mail. It was returned to WordPerfect by Prows' sister, signed by Tom Wohlschlaeger for NISC.

The Defense Case

Prows testified in his own defense that his role in the transaction was simply to send WordPerfect a site license referral for NISC, which he believed was a real company because it was represented as such to him by Baker. He testified that he relied on WordPerfect to do a background check on NISC because the site license ultimately was between NISC and WordPerfect. He admitted knowing that Richard Hirsch was arranging to sell part of the software shipment. However, he said he did not think much of the resale because "sideways deals" were common in the computer industry. Prows testified that when he asked Baker about the diversion of software to other buyers, Baker said that certain units were going to car dealers, which were subsidiaries of NISC.

- 8 -

Prows testified that he thought that was a "good story" and he repeated it to WordPerfect.

On direct examination, Prows testified that he did not arrange to have the product delivered to him, and that he was surprised when it arrived. He also said that he had not expected a check from Softsell. However, on cross examination, Prows admitted that he had requested that the product be delivered to him. He also admitted that he knew that Baker was using the false name Wohlschlaeger and that he had told Winn that he did not want WordPerfect to find out about the check from Softsell.

Prows' sister, Annette P. Snelgrove, testified that she hand-delivered the site license from Prows to Baker, waited for Baker to sign it, and then returned it to WordPerfect.

Although the indictment charged Prows as both a principal and an aider and abetter in the scheme, the government abandoned the charge of aiding and abetting against Prows at the time of the jury instruction conference. The jury convicted Prows on one count of mail fraud and three counts of wire fraud. After this Court rejected his direct appeal, Prows brought a habeas action pursuant to 21 U.S.C. § 2255, claiming ineffective assistance of counsel.

**Ineffective Assistance of Counsel Claim**

At the trial, Prows was represented by attorney Edwin Guyon. Prows' claim of ineffective assistance focuses on Guyon's failure: (1) to interview James Baker, a key witness in the prosecution's case; (2) to interview or call as a witness John P. Sampson, a civil attorney who had previously represented Prows and who had earlier interviewed Baker; (3) to obtain or offer WordPerfect records at the trial or to call WordPerfect employees as witnesses; and (4) generally to investigate the allegations, to interview witnesses, and to prepare for trial.

The district court held a hearing on the claim. At the hearing, John Sampson testified that he is an attorney in Ogden, Utah, and that he represented Prows on certain civil matters in 1988, during the time that the FBI interrogated Prows. Sampson testified that he had spoken to Baker several times after the FBI began their inquiry and that Baker assured him that Prows "did not have a part in organizing any scheme or the company that was going to take the ultimate distribution of these programs, that that was totally his doings, and that he had asked [Prows] to get him a site license, as far as it was to get them transferred." Sampson also testified that Baker said that Prows did not know the software was going to be distributed to other places.

Prows testified at the hearing that he had told his criminal attorney Edwin Guyon about the conversations Sampson had with Baker. He claimed that he

urged Guyon to contact Sampson. Prows testified further that his only meetings with Guyon prior to trial were a two-hour initial meeting and a brief conversation before the arraignment. He said that Guyon did not prepare him for trial. He testified that he did not learn when the trial was to take place until a day before the trial was to begin. In fact, the trial was postponed for a day to allow him to return from California, where he was operating another business.

Guyon also testified at the hearing. He explained that he had contacted Baker's attorney who said that Baker would not voluntarily speak with him. He also said that he thought Baker would be a weak witness whose credibility could be attacked because, although he had pled guilty, he had not yet been sentenced. Guyon testified that he had not interviewed anyone at WordPerfect because he believed that he could make his case with statements taken from WordPerfect employees by the FBI. Guyon admitted that he hadn't contacted Sampson in preparation for the trial and that he hadn't informed Prows of the trial date until the day before the trial was to begin.

The district court granted Prows' motion to vacate the judgment pursuant to 28 U.S.C. § 2255. The court found that Guyon's failure to interview or call Sampson as a witness to impeach Baker's testimony fell below the standard of conduct for a reasonable attorney. Further, the court found that because Baker

was the only witness who identified Prows as an architect of the scheme, the failure to impeach Baker prejudiced Prows. The government now appeals.

## ANALYSIS

Whether a defendant received effective assistance of counsel is a mixed question of law and fact that we review de novo. Selsor v. Kaiser, 81 F.3d 1492, 1497 (10th Cir. 1996).[2] To prevail on a claim of ineffective assistance of counsel, a convicted defendant "must show that counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that the deficient performance prejudiced the defendant. Id. at 687. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The district court rejected most of Prows' contentions regarding the performance of counsel, finding that overall Guyon's representation of Prows

---

[2]"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," Strickland v. Washington, 466 U.S. 668, 698 (1984), that we review de novo. United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1994). However, we accept the factual findings of the district court unless they are clearly erroneous. Brewer v. Reynolds, 51 F.3d 1519, 1523 (10th Cir. 1995), cert denied, 116 S. Ct. 936 (1996).

"evidenced professional competence."[3]  D.Ct. Order at 24.  However, the court

did find counsel's performance deficient in one "very precise--and narrow"

respect: that Guyon failed to investigate whether John Sampson should be called

as a witness to rebut Baker's testimony at trial.  Id. at 25.  The court held that the

failure was prejudicial because Baker's testimony was the only evidence that

directly implicated Prows as an architect of the scheme.  "Baker's testimony--and

only Baker's testimony--directly inculpated Prows in the formation of the alleged

scheme or artifice to defraud."  Id. at 18.  The district court emphasized that

> [w]hile Baker's testimony concerning Prows' overall knowledge of
> the alleged nature of the transaction with WordPerfect was not by
> any means the only evidence upon which a reasonable juror could
> base a finding of guilt, as to the crucial facts bearing upon whether
> Prows had "devised . . . any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises," Baker's testimony largely
> stands alone.  That the Government's case against Prows was
> submitted to the jury without a theory of aiding and abetting only
> amplifies the importance of Baker's testimony that, as the
> Government argued, "he and Mr. Prows together designed this
> scheme from the outset."

D.Ct. Order at 22 (emphasis in original).

The district court held that to find Prows guilty of mail fraud or wire fraud

the jury would have had to find beyond a reasonable doubt that "Prows 'devised or

intend[ed] to devise a scheme or artifice,' not merely that Baker had devised such

---

[3]Prows does not raise the correctness of these rulings on appeal.  Thus, we decline to address them.

a scheme and that Prows knowingly lent assistance of some kind to Baker." D.Ct. Order at 13 (emphasis in original). In fact, the court stated that "proof that Prows lent Baker substantial assistance--even <u>knowing</u> assistance--in furthering Baker's scheme to obtain WordPerfect products under the name of National Insurance Service Company, and on terms otherwise unavailable to him as an individual, cannot suffice." <u>Id</u>. at 26-27 (emphasis in original). Based on this view of the case, the court found that Guyon's failure to investigate calling Sampson as a witness to impeach Baker prejudiced Prows because had Sampson testified there was a reasonable probability that the outcome of the trial would have been different. The court's premise--that to convict Prows under the mail and wire fraud statutes it was necessary to prove that he alone or with Baker initially devised the scheme--was incorrect. Although both the mail fraud and the wire fraud statutes, 18 U.S.C. §§ 1341, 1343, contain the language "whoever, <u>having devised or intending to devise</u> any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . ", (emphasis added) under well-established Tenth Circuit precedent a defendant may be convicted under either statute if the government shows that the defendant joined a scheme devised by someone else, as long as the defendant possessed the intent to defraud. <u>United States v. Wright</u>, 826 F.2d 938, 947 (10th Cir. 1987) (affirming conviction for wire fraud based on "participation in [a] fraudulent scheme");

- 14 -

United States v. Gamble, 737 F.2d 853, 856 (10th Cir. 1984) (mail fraud); United States v. Washita Constr. Co., 789 F.2d 809, 817 (10th Cir. 1986) (mail fraud); United States v. Gann, 718 F.2d 1502, 1505 (10th Cir. 1983) ("A defendant may be convicted of mail fraud if he knowingly and willfully participates in a fraudulent scheme created and set in motion by others."); Hofmann v. United States, 353 F.2d 188, 191 (10th Cir. 1965) (conviction for mail fraud does not require proof that defendant originated a scheme to defraud but only "knowing participation by the defendant in a scheme to defraud"). See also United States v. Earles, 955 F.2d 1175, 1177 (8th Cir. 1992) ("One who knowingly participates in an ongoing mail fraud devised by another is guilty of mail fraud."); United States v. Sturm, 671 F.2d 749, 751 (3rd Cir. 1982) (intent to commit mail fraud "may be shown by evidence that the defendant devised the scheme or participated in it with knowledge of its fraudulent nature") (internal citations and punctuation omitted). Furthermore, a scheme to defraud under 18 U.S.C. § 1341 may be shown by a defendant's reckless indifference to the truth of representations. United States v. Reddeck, 22 F.3d 1504, 1507 (10th Cir. 1994) (internal quotations omitted). As the authors of a recent survey of criminal law explain in connection with the intent requirement of mail and wire fraud,

> [b]ecause intent involves the defendant's state of mind, and is difficult to prove directly, it is usually proven by circumstantial evidence. A variety of circumstantial evidence has been held relevant to infer fraudulent intent. Intent may be inferred from

- 15 -

evidence that the defendant attempted to conceal activity. Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use.

Kathleen Flavin & Kathleen Corrigan, Eleventh Survey of White Collar Crime: Mail Fraud and Wire Fraud, 33 Am. Crim. L. Rev. 861, 869-70 (1996) (citations and internal punctuation omitted).

In this case, the government introduced abundant evidence, apart from Baker's testimony, of Prows' intent to defraud. There was evidence that Prows made statements to WordPerfect knowing them to be false or, at the very least, without regard to their truthfulness. FBI agent John Nelson testified that Prows admitted knowing that NISC was a nonexistent company and that Tom Wohlschlaeger was a nonexistent person. According to WordPerfect Vice President Winn, Prows requested that the software be shipped to Computerland for reshipment to NISC's insurance agents around the country. Karen Fossum-Zumkowski, a marketing assistant at WordPerfect, testified that Prows told her that NISC was an affiliate of E.R.A. Realty. Prows himself admitted that he told WordPerfect a "story" about the diversion of software.

The government introduced evidence that Prows attempted to conceal his activities. Nelson and Winn testified--and Prows admitted--that Prows told them not to tell WordPerfect about the resale of the software to Softsell or of the

existence of the check from Softsell. There was evidence that Prows knew that Baker was misrepresenting himself to WordPerfect. Nelson testified that Prows admitted that Baker had made phone calls from Prows' office to find buyers for the software. Prows admitted knowing that Baker was using the fictitious name Wohlschlaeger to sign NISC documents. Finally, evidence showed that Prows would have profited from a successful scheme. Nelson testified that Prows said that he would have received perhaps one-third of the profits from the scheme.

Even if Sampson had been called as a witness and had discredited Baker's testimony, Prows has not established that there is a reasonable probability that the outcome of the criminal trial against him would have been different. There was still overwhelming evidence from other witnesses, including Prows himself, to establish Prows' guilt. See Nickel v. Hannigan, 97 F.3d 403, 408-09 (10th Cir. 1996) (attorney's failure to suppress testimony of one witness not prejudicial under Strickland where other witnesses' testimony was sufficient to establish government's case), cert. denied, 117 S. Ct. 1112 (1997); United States v. Haddock, 12 F.3d 950, 956-57 (10th Cir. 1993) (failure to investigate rebuttal testimony not prejudicial under Strickland where conviction was supported by testimony from other witnesses). Thus, we cannot find that Prows was prejudiced by his counsel's failure to interview or call Sampson. Because Prows has failed to demonstrate that he was prejudiced by his counsel's performance, we need not

decide whether such performance fell below the standard for a reasonable attorney. See Strickland, 466 U.S. at 697; Davis v. Executive Dir., 100 F.3d 750, 760 (10th Cir. 1996), cert. denied, 117 S. Ct. 1703 (1997).

For the reasons set out above, we REVERSE the district court's grant of Prows' petition on the grounds of ineffective assistance of counsel.