**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Raymond J. MASTEN, Defendant–
Appellant.**

No. 97–3443.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1998.

Decided March 30, 1999.

Darilynn J. Knauss, K. Tate Chambers (argued), Office of the United States Attorney, Peoria, IL, for Plaintiff–Appellee.

Marcia G. Shein, Richard D. Biggs (argued), Atlanta, GA, for Defendant–Appellant.

Before COFFEY, EASTERBROOK and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

On October 25, 1995, a grand jury in the Central District of Illinois indicted defendant-appellant Raymond J. Masten for orchestrating a financial scheme designed to fraudulently induce others to invest money into his struggling company. On March 11, 1997, after a jury trial, Masten was convicted on three counts of mail fraud (18 U.S.C. § 1341) and two counts of money laundering (18 U.S.C. § 1956(a)(1)(A)(I)) and sentenced to a term of eighty-seven months of impris-onment followed by three years' supervised release. On appeal, Masten challenges the sufficiency of the evidence concerning the mail fraud count as well as his conviction for money laundering. We affirm.

## I. BACKGROUND

In January 1989, five individuals founded Softron International, Inc., in Chino, California, to market a water conditioning device.[1] The founders determined that sales would be made by distributors. In order to become a distributor, interested individuals paid a joining fee to the founders and earned commissions through the sales of the company's products. As an additional means of earning income, distributors could recruit others into the sales force and thus would be eligible to earn a partial commission for each sale the recruits made. Those distributors who were successful in bringing new recruits into the organization were said to have a "downline."[2]

The defendant-appellant Masten, though not one of the five founders, became a Softron distributor in autumn 1989 and commenced recruiting new members into his "downline." As of December 1990, Masten had assembled the largest downline, and was generating the largest income, of any distributor. At the end of 1990 Softron was in dire financial straits, unable to meet its tax burden, much less pay commissions to distributors. The company also fell behind on payments to suppliers, and the firm's liabilities mounted until, in the month of March 1991, the company's financial statement reflected a negative net worth of $650,000. Masten claims that he was not aware of the extent of the company's financial difficulties until June 17, 1991, when he was invited to sit in on a board meeting. The directors at that meeting offered him the position of chairman of the board of Softron, and he accepted, in spite of the fact that until then he had not played any part in the company's manage-

---

1. Softron International eventually distributed other products as well, including a polymer agricultural "hydrosoil," but according to the record the water conditioning device was Softron International's most popular product.

2. A downline is defined as "the commission on sales made by new distributors you recruit instead of through sales you make yourself." National Association of Attorneys General: Consumer Protection Report, Twenty Attorneys General Join FTC in "Surf Day" (January 1997).

ment. After reviewing the company's balance sheet, Masten felt that unless $700,000 in emergency funds were raised within seven days, Softron might be forced to cease operations. With the approval of the board of directors, he sought to raise the emergency capital from the distributors in his downline.[3] With the assistance of two venture capitalists named Charles Whitlock and Michael Dodak,[4] Masten organized a general partnership, called the Softron Distributorship Investment Group ("SDI"), in order to raise the emergency capital. Whitlock, Dodak and Masten agreed that after raising the sum of $700,000, the general partnership would use $250,000 of this money to purchase 30% ownership in Softron. The balance would be lent to Softron, collateralized by Softron's assets.

Following the board meeting, Masten informed a number of distributors of the creation of the SDI partnership. Those distributors who expressed interest in SDI were sent a "fact sheet" to convince them to invest in SDI. This document contained statements that were at odds with the arrangement Masten had made with Dodak and Whitlock. For instance, the sheet, after explaining that SDI was in the process of raising $700,000 through the sale of thirty-five partnership units at $20,000 apiece, stated that *all* of the money would be used to purchase Softron stock. This proposal contradicted the arrangement Dodak, Whitlock and Masten had settled upon; their agreement had provided that only $250,000 of the $700,000 would be used to purchase stock, and the remainder would be lent to Softron, secured by Softron's assets. Also according to the material set forth in the fact sheet, if $700,000 was raised, the partnership would purchase 20% of the total outstanding shares of Softron International;[5] Masten, Dodak and Whitlock

had previously agreed, however, that *$250,- 000* of the SDI funds would be used to purchase *30%* of Softron. The fact sheet also had an escape clause which provided that investors who subsequently had second thoughts about investing in SDI could withdraw their investment within 180 days and receive a full refund, plus 10%. The fact sheet failed to address Softron's financial problems, and Masten, when discussing the investment proposal with potential investors, never informed them about Softron's financial straits, including its outstanding liabilities and its negative net worth. Instead, Masten advised prospective investors that Softron was "on the wave up of opportunity," and predicted that each of the $20,000 investment units would be worth $1 million in two to five years. Also, in an attempt to promote and seek his financial product, he told investors that he had gone from selling encyclopedias and facing bankruptcy prior to joining Softron to receiving a monthly salary of $100,000 and now also owned a million dollar home.

At the end of the month of June 1991, Dodak and Whitlock became concerned about Masten's actions, particularly the fact that he had unilaterally changed the terms of the proposed partnership in the fact sheet without making that information available to them. Around the same time, Dodak and Whitlock received access to Softron's internal financial data, which revealed that Masten had grossly underestimated Softron's negative net worth and had overstated Softron's accounts receivable. They realized that the $700,000 figure that Masten had previously represented to them as a sufficient amount to keep Softron running would be inadequate to save the company. On July 2, 1991, Dodak sent Masten a facsimile letter delineating his

---

3. At this time about 99% of the Softron distributors were in Masten's downline.

4. Dodak and Whitlock were not Softron distributors. Their initial contact with Softron occurred in "late 1990 or early 1991" (the record is no more specific than that) when they entered into an agreement with Softron through which Softron sold their "hydrosoil" product. At some time before June 1991 (the record does not reveal when) Whitlock purchased from one of the five founders a proxy for 30% of the Softron stock. Dodak and Whitlock agreed to work with

Masten on the details of the partnership because they thought the company had promise and were thus interested in possibly acquiring part ownership of the company at some later date; Masten, for his part, welcomed Dodak and Whitlock's help in forming the partnership because they had experience in this area.

5. Should SDI fail to raise the full $700,000, the partnership would purchase as much Softron stock as it could.

concerns that Softron was severely undercapitalized, even with the $700,000 being raised. Masten never responded to Dodak and continued to solicit investors.

Through Masten's efforts, by the end of August 1991 SDI had received some $460,000 in new investment money. Even though the fact sheet stated that SDI would begin to purchase Softron stock as soon as the SDI fund contained $300,000, Masten did not purchase any Softron stock for SDI. Instead, Masten used part of the invested money to purchase the company's stock for himself. On October 17, 1991, Masten and Softron President Lorne Bay ("Bay") used $129,000 of SDI-invested money to purchase all outstanding shares of the Softron stock. Masten received 60% of the stock, and Bay received 40%. Masten did not inform SDI investors that he and Bay had purchased all of the Softron stock, and in fact continued to solicit investors. In December 1991, after raising $824,500 for SDI and exceeding his stated goal of $700,000, Masten announced that three SDI investment units were still available. He not only sold these three units but went on to sell another twelve units, ultimately extracting (at the end of the scheme) $1,071,000 from fifty-three SDI investors. By January 1992 the company's lack of sales had caused Softron's net worth to fall to negative $1,200,000. The SDI investors never received the stock promised, as Masten refused to turn over the stock certificates that he and Bay had purchased for themselves.

Not only did Masten fail to provide SDI investors with stock, he also welched on his promise to refund the parties' investment monies when they so requested. The first request for a refund was made in August of 1991, and within a year a number of other SDI investors sought refunds totaling some $165,000. Masten ignored the majority of these requests and stated that the money would be "returned soon."

In April of 1992, Masten offered to sell 5% of Softron's stock for $125,000 to distributor George Varnell. Varnell, even though interested in the promotion, stated that he did not presently have capital available to pay for the stock. In order to accomplish the sale, Masten refunded $20,000 to Varnell, funds which Varnell had previously invested in SDI, on the condition that Varnell immediately reinvest the money as a down payment on his purchase of 5% of Softron's stock. Masten sent Varnell $20,000 which was the proceeds of the investment of three distributors, James Thomas, Gordon Thomas and Etna Lane, who had recently joined and pooled their resources of $20,000 for the joint purchase of one SDI partnership unit. Varnell returned the same $20,000 to Masten as agreed but never received any Softron stock.

In September 1992, when Softron's financial condition had deteriorated to the point of bankruptcy, the State of California's Board of Equalization threatened to seize Softron's assets for nonpayment of taxes. Masten reorganized Softron as a new company in Nevada and moved the company's existing product stock from Chino, California, to Las Vegas, without informing the state authorities or Softron's board of directors and stockholders. He called the new company International Magnetics Corporation ("IMC"). On October 23, 1992, the California Board of Equalization seized those Softron assets that were left behind, including furniture, computers, and furnishings.

On September 13, 1996, a federal grand jury in the Central District of Illinois[6] charged Masten in a nine-count indictment. The indictment charged Masten with five counts of mail fraud, in violation of 18 U.S.C. § 1341. The indictment also charged Masten with one count of engaging in a financial transaction in criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957 (Count Six), and with three counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I) (Counts Seven through Nine).

Masten went before a jury and was found guilty of committing mail fraud as charged in Counts Two, Three and Four, and of money laundering as charged in Counts Seven and

6. The indictment was returned in Illinois and not in California because many of the victim witnesses were residents of the State of Illinois.

Nine. Masten was acquitted of Counts One and Five (mail fraud), Count Six (engaging in a criminal financial transaction), and Count Eight (money laundering). The trial judge sentenced Masten to a term of 60 months' imprisonment on Counts Two, Three and Four, to run concurrently with 87 months' imprisonment on Counts Seven and Nine. Masten was also ordered to serve three years' supervised release and to pay restitution in the amount of $1,449,717.[7]

## II. ISSUES ON APPEAL

Masten contends that the evidence presented at trial was insufficient to convict him for mail fraud or money laundering, and thus his convictions should be overturned. Specifically, dealing with his mail fraud conviction, he argues that 1.) the prosecution failed to demonstrate that his scheme would have defrauded a reasonable investor (i.e., an investor of "ordinary prudence and comprehension," *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir.1996)); and 2.) there is no evidence in the record to demonstrate that the mailings of fact sheets and SDI receipts *furthered* his scheme. As for the money laundering conviction, Masten claims that the evidence fell short of demonstrating that he used his ill-gotten proceeds to further his scheme.

## III. ANALYSIS

When reviewing a conviction for sufficiency of the evidence, we neither reweigh the evidence nor do we substitute our judgment of the facts for that of the factfinder. *See United States v. Hatchett*, 31 F.3d 1411, 1416 (7th Cir.1994). We consider the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Reversal is warranted " 'only when the record is devoid of any

evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.' " *United States v. Garcia*, 35 F.3d 1125, 1128 (7th Cir.1994) (quoting *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992)).

### A. Mail Fraud

Under 18 U.S.C. § 1341, the mail fraud statute,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

To establish that a defendant has committed the crime of mail fraud under this statute, the government must demonstrate that the defendant: (1) participated in a scheme to defraud; (2) had an intent to defraud; and (3) used the mails in furtherance of the fraudulent scheme. *See United States v. Strang*, 80 F.3d 1214, 1219 (7th Cir.1996).

As to the first element, Masten does not argue that the evidence was insufficient to establish that he participated in a scheme to defraud, and he would be hard pressed to

---

7. The sentencing judge ordered restitution in the amount of $1,449,717 when the total loss to SDI investors was $1,071,000 because of his finding that, in addition to the loss suffered by SDI

investors, Masten's fraudulent scheme had caused an additional $400,000 in losses suffered by people who invested directly into Softron (not into SDI).

do so, since the record evidence overwhelmingly establishes that repeatedly Masten misled the SDI investors about the status of SDI, Softron, and their investments. There are numerous examples in the record of his intent to defraud: the defendant's nefarious intent is demonstrated by his unilateral alteration of the partnership agreement; his misrepresentations about Softron's financial situation; his refusal to return the money of investors who asked for a refund; and the fact that he utilized SDI money to purchase Softron stock for himself, subsequently refusing to turn over the stock to the SDI investors. As for the third element, the requirement that the defendant used the mails in furtherance of the scheme, this element is satisfied through the testimony of SDI victims who stated that the defendant mailed (and they received) SDI receipts and SDI agreements.

■ Masten argues that the second element, the intent to defraud element, was not satisfied. Starting from the premise that a mail fraud conviction cannot stand unless the scheme was "reasonably calculated to deceive persons of ordinary prudence and comprehension," *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir.1996), he argues that his victims acted imprudently when they invested in SDI without having first researched Softron's solvency. The government responds that it is a distortion of the mail fraud statute to aver that imprudent persons are not protected from con men, maintaining that the mail fraud statute protects the reasonable and the unreasonable alike. The government also argues that the SDI investors *did* act reasonably in relying on Masten's statements regarding Softron's success (i.e., that Softron was on the "wave up" of opportunity, and that Softron allowed Masten to go from selling encyclopedias to living in a million dollar home), since the defendant had earned their trust through being their lifeline to the company (all the SDI investors were in his downline).

This "unreasonable victim" argument is not particularly innovative; we examined a similar claim in *United States v. Coffman*, 94 F.3d 330 (7th Cir.1996). In *Coffman*, the defendants approached a brokerage house,

Smith Barney, posing as wealthy stockholders seeking to sell several million dollars of stock. They represented to Smith Barney brokers that if Smith Barney loaned them $300,000, collateralized with (fictitious) stock, they would sell the stock on the market through the brokerage house. Smith Barney immediately became suspicious since "[i]t is unusual for someone to want to sell millions of dollars of stock through whoever just happens to pick up the phone at a brokerage house with which the caller appears to have had no previous dealings." *Id.* at 332. Smith Barney called in the Federal Bureau of Investigation, which investigated the matter and ultimately arrested the defendants for wire fraud. After a jury found them guilty of a wire fraud charge, the defendants appealed their conviction and presented an argument similar to Masten's, contending that their conviction should be overturned because their inept scheme was too unbelievable to fool any reasonable brokerage house. We rejected the defendant's argument, explaining that this Circuit is aligned "with those courts that hold that the mail- and wire-fraud statutes protect [unreasonable persons] against frauds directed against them ...." *Id.* at 334.

■ We recognized in *Coffman* that, in some mail fraud cases, it may be helpful to examine whether a "reasonable person" would be deceived by a defendant's scheme, but we went on to explain that a "reasonable person" analysis is appropriate only in the special circumstance where the defendant claims that he did not *intend* to deceive anyone. *See id.* at 334 ("reasonable person" language has the purpose of "guid[ing] the jury in evaluating circumstantial evidence of fraudulent intent: that the defendants' scheme was calculated to deceive a person of ordinary prudence is some evidence that it was intended to deceive") (citing *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389–90 (6th Cir.1996)). For example, if a defendant car salesman claims that he was merely *joking* (and did not intend a fraud) when he represented to a prospective buyer that a similar make and model car would be included with the purchase of one new car, then it may conceivably be appropriate to

apply the "reasonable person" standard (to ascertain whether a person in the position of an ordinary purchaser of a motor vehicle would have reason to believe the representation). Such an application of the "reasonable person" standard might assist the finder of fact in determining whether the element of intent was indeed present. But if it can be established that the defendant intended to deceive a victim, and the victim was duped, then it makes no difference that the victim lacked prudence and that a more astute person would not have been deceived. *See id.* ("The fact that a reasonable person would not have been deceived would be no more relevant than the fact that a murder victim would have survived had he been wearing a bulletproof vest.").

Applying *Coffman* to the case *sub judice*, even if Masten were to convince this Court that a "reasonable person" would not have invested in SDI, this fact would not serve to rescue him from his conviction for mail fraud, since, as we explained in *Coffman*, the mail fraud statute also protects unreasonable persons. Furthermore, the fifty-three persons who invested in SDI included a psychology Ph.D., an options trader, a high school teacher, and a real estate broker, among others, and the mere fact that a number of educated professionals *were* defrauded quite clearly establishes that Masten's scheme was plausible enough to dupe a "reasonable person."

■ As a second attack on the mail fraud conviction, Masten focuses upon the third element of mail fraud, the requirement that the defendant used the mails in furtherance of the scheme, *see Strang,* 80 F.3d at 1219. He contends that the mailings set forth in Counts Three (Masten mailing an SDI receipt to investor James Thomas) and Four (Thomas mailing a signed SDI agreement to Masten) failed to *further* his scheme. According to Masten, these mailings did not *further* the fraudulent scheme since the mailings did not occur until *after* the fraudulent scheme was complete (Thomas had previously sent his money to Masten). Masten's argument is far from convincing, since the mailings, serving to assure Thomas that his money had been properly invested into SDI, lent an air of legitimacy to Masten's scheme and thus postponed investigation of the scheme. *See United States v. Lack,* 129 F.3d 403, 408 (7th Cir.1997) ("Mailings which occur after the defendant has obtained the victims' money are in furtherance of the scheme if they facilitate concealment or postpone investigation of the scheme."), citing *United States v. Ashman,* 979 F.2d 469 (7th Cir.1992); *see also Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In *Schmuck,* a used car distributor was convicted of mail fraud for purchasing used automobiles, rolling back their odometers and reselling them. In turn the dealer who purchased the automobiles from the defendant submitted a title-application form to the state department of transportation and unknowingly included on the application form the false odometer readings. The defendant in *Schmuck* contended that the mailing element of the mail fraud charge could not stem from the mailing of the title application, arguing that the actual mailing occurred "after the fraud has come to fruition, is merely tangentially related to the fraud, and is counterproductive in that it creates a 'paper trail' from which the fraud may be discovered." *Id.* at 711, 109 S.Ct. 1443. The Supreme Court rejected the defendant's argument, holding that the defendant's mailings "furthered" the scheme since they facilitated the scheme's continuance by convincing the dealers that the defendant's sales operation was legitimate:

> [A] rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title. Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in [the defendant] or had not been able to resell the cars obtained from him. These resales and Schmuck's relationships with the retail dealers naturally depended on the successful passage of title among the various parties. Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the

passage of title, which in turn was essential to the perpetuation of Schmuck's scheme. *Id.* at 712, 109 S.Ct. 1443.

Like the mailings in *Schmuck*, the mailings set forth in Counts Three and Four aided the concealment of Masten's scheme, since Thomas would undoubtedly have begun to question Masten if he had not received the receipt and/or the agreement. The mailings thus allowed Masten to maintain the position of trust which he held with the SDI investors. We agree with the jury's findings that the mailings in Counts Three and Four furthered Masten's scheme to defraud, and we refuse to reverse the jury's conviction.

### B. Money Laundering

■ Masten also challenges the sufficiency of the evidence to support his conviction under 18 U.S.C. § 1956(a)(1)(A) for money laundering.[8] He contends that the government failed to establish that Masten used the SDI investments to prolong his unlawful activity. The government responds that Masten's use of SDI funds to pay Softron commissions and refund George Varnell's investment money allowed him to continue the scheme.

■ To convict a defendant on a money laundering count, the government is required to demonstrate that the defendant (1) conducted a financial transaction affecting interstate commerce with property representing the proceeds of some illegal activity; (2) knew the property represented illegal proceeds; and (3) conducted the transaction with the intent of promoting the unlawful activity. *See United States v. Emerson,* 128 F.3d 557, 561 (7th Cir.1997).

The government presented evidence that the defendant used the $20,000 received from the pooled funds of three investors (James Thomas, Etna Lane and Gordon Thomas) to refund George Varnell's $20,000 investment, in order that Varnell might use the $20,000 as a down payment to purchase Softron stock directly from Masten. Masten's technique— paying off an earlier investor (Varnell) with the money supplied by subsequent investors—is a classic component of the well known fraudulent Ponzi scheme.[9] *See United States v. Brown,* 47 F.3d 198, 201 n. 1 (7th Cir.1995) ("The classic Ponzi scheme involves individuals ... who convince investors to purchase interests in phony or unprofitable ... partnerships, paying off old investors with the money from new investors.") (citations omitted). Just as the payoff of an initial Ponzi investor perpetuates a Ponzi scheme, the $20,000 refund to Varnell also served to promote Masten's SDI fraud, since the refund not only served to foster good will among the distributors, but it also served to nurture the (false) impression that distributors who asked for their money back would receive it.

The government also produced evidence that Masten used SDI proceeds to pay commissions to Softron distributors, which in turn served to perpetuate Masten's scheme since the distributors, when receiving commissions, were led to believe that Softron was a profitable company and a good investment. The distributors themselves were also potential SDI investors, so Masten, by using SDI capital to create a veneer of profitability for Softron, encouraged SDI investment. It is a hallmark of a Ponzi scheme to convince potential investors that capital supplied by investments is in fact profit. *See Bosco v. Serhant,* 836 F.2d 271, 274 (7th Cir.1987) ("As in a Ponzi scheme, Serhant was using newly invested money to make old investors

---

**8.** 18 U.S.C. § 1956(a)(1)(A) provides:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity ...

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is great-

er, or imprisonment for not more than twenty years, or both.

**9.** The term "Ponzi scheme" is derived from Charles Ponzi, a famous Boston swindler. "With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due." *United States v. Shelton,* 669 F.2d 446, 449 (7th Cir.1982).

think they were earning profits rather than losing their shirts."). *See also In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1332 n. 1 (10th Cir.1996) (defining a Ponzi scheme as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, [the scheme's victims] are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors."). Thus, since the proceeds referred to in Counts Seven and Nine were used to keep Masten's scheme afloat, we hold that there is more than adequate evidence in the record to sustain Masten's money laundering conviction.

## CONCLUSION

The evidence in the record of Masten's guilt is more than sufficient to sustain his convictions for mail fraud and money laundering.

AFFIRMED.