**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 2 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOHN W. WALSH, JR.,

Defendant - Appellant.

No. 00-1316

(D. Colorado)

(D.C. No. 98-CR-68-N)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

---

Defendant John Walsh, Jr. was convicted following a jury trial on nine counts of mail fraud in violation of 18 U.S.C. § 1341. On appeal, he argues that his conviction must be vacated because the evidence failed to prove beyond a reasonable doubt that he had the requisite intent to defraud. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. BACKGROUND

Defendant was the President and CEO of InterCap Funds Joint Venture (the "Joint Venture"), a general partnership whose business was monitoring and servicing burglar alarms. In addition, Defendant owned all the common stock and was the sole officer and director of InterCap Monitoring Corporation ("IMC") and held a controlling interest in Security Data Group, Inc. ("SDG"). Appellant's App. at 453, 462-64. IMC and SDG were the managing general partners of the Joint Venture. Seven limited partnerships (referred to collectively as the "Funds" herein) were general partners in the Joint Venture. IMC was the general partner of five of the Funds and SDG was the general partner of the remaining two Funds. Id. at 449-50.

The Internal Revenue Code requires that "[e]very partnership . . . shall make a return for each taxable year . . . and shall include in the return the names and addresses of the individuals who would be entitled to share in the taxable income if distributed and the amount of the distributive share of each individual." 26 U.S.C. § 6031. After the partnership return is prepared and the partnership's profit or loss is allocated among the partners, the partnership must prepare a Schedule K-1 for each partner. A Schedule K-1 lists the portion of the partnership's profit or loss allocable to the partner. The partners then report the

profit or loss allocated to them on their K-1s in their individual, corporate, or partnership income tax returns, as the case may be.

From 1992 to 1995, the Joint Venture filed a partnership tax return and prepared a K-1 for each of its partners. Employees of the Joint Venture also prepared partnership returns and K-1s for the Funds. The K-1s relating to the Funds were sent to the Funds' partners/investors, most of whom were individuals. Defendant oversaw the annual preparation of the various partnership tax returns and K-1s. Appellant's App. at 162. Defendant would sign the partnership returns as the managing general partner.[1] Id. at 167-68.

In approximately October of 1994, the Joint Venture filed for Chapter 11 bankruptcy protection. Id. at 79-80. Defendant continued to run the Joint Venture as debtor in possession. None of the partners in the Joint Venture were in bankruptcy. Sometime after the bankruptcy filing, several of the limited partners formed the Official Creditors Committee of Limited Partners (the "Partner Committee") and hired an attorney to represent their interests in the bankruptcy proceedings. The Partner Committee moved the bankruptcy court to appoint a trustee. The bankruptcy court held a hearing on March 4, 1996, in order

---

[1]The testimony cited actually states that Defendant would sign the K-1s as the managing general partner. However, a Schedule K-1 is not signed, but is merely an informational document that is sent to each partner. Only the partnership return itself is signed. We presume, therefore, that the witness meant that Defendant signed the partnership tax returns.

to consider that motion and to consider a proposed $30 million asset sale by the Joint Venture. Id. at 80-81, 352. At the hearing, Defendant resigned as CEO of the Joint Venture, whereupon the court granted the Committee's motion to appoint a trustee. Id. at 149-50.

After Defendant's resignation, the Joint Venture ceased paying his salary, the lease on his vehicle and the management fee it had previously paid to IMC. Id. at 155, 157-58, 458. IMC had used the management fee received from the Joint Venture to pay for, among other things, a $1 million life insurance policy insuring Defendant's life and naming Defendant's wife as sole beneficiary. Id. at 319-21. After the Joint Venture stopped paying IMC its management fee, IMC had no money. Id. at 458.

On March 5, 1996, the day after Defendant's resignation, Harvey Sender, a Denver attorney, was appointed trustee of the Joint Venture by the bankruptcy court. Id. at 79. At the time of Sender's appointment, the $30 million asset sale was pending. The asset purchase agreement provided that the sale had to close, if at all, by the end of March 1996. Id. at 86. At a meeting with key employees of the Joint Venture on March 6, 1996, Sender told Jim Bain, a computer programmer who had written the software and maintained the investor information databases used to generate K-1s in the past, and Elizabeth Hearty, then known as Elizabeth Geiger, the Joint Venture's controller, to stop working

-4-

on the K-1s and to devote all of their time to the asset sale.  Id. at 103-04, 111-14.
Sender indicated to Hearty that the Joint Venture would not prepare the returns
and K-1s internally, but that it would hire an accountant to do them later.  Id. at
103-04, 111.  Sender believed that the Joint Venture had the legal obligation to
prepare the partnership returns and K-1s for itself and the Funds.  Id. at 109.

Hearty and Bain both related their conversations with Sender about the
K-1s to Defendant.  Hearty told him that Sender had not yet decided if he would
prepare the K-1s.  Id. at 166-67.  However, she also admitted that she may have
told Postal Inspector Allen that Sender never said he would not prepare the K-1s.
Id. at 173.  Bain told Defendant that Sender said that the K-1s were a low priority
and that he did not think he was going to do them.  Id. at 480-81.  But, Bain
testified before the grand jury that Defendant told him that Sender was not going
to do the K-1s, not the other way around.  Id. at 497.  At trial, he could not
remember which way the conversation had gone.  Id.  Bain admitted that he was a
social friend of Defendant's and that Defendant had bought him dinner the night
before his trial testimony.  Id. at 490, 507-08.

In the early part of 1996, Defendant spoke several times with Carl Sims, an
attorney, about who was responsible for preparing partnership returns and K-1s
for the Funds.  Sims told Defendant that IMC was legally responsible for
preparing the partnership returns and K-1s for the five Funds for which it was the

general partner. Id. at 451-53. He did not indicate that he thought Defendant was responsible for preparing the return for the Joint Venture. Sims also explained that Defendant, as the sole officer of IMC, was the only person authorized to sign the partnership returns for those five Funds. Id. at 453-54. It was Sims' view that since neither IMC nor any of the Funds was in bankruptcy, Sender had no authority to use funds of the bankruptcy estate to prepare the partnership returns for those entities or to sign them. Id. Lastly, Sims warned Defendant that the Internal Revenue Code provided for a penalty of $50 per month per K-1 if the K-1s were not timely prepared and delivered. Id.

On March 12, 1996, Defendant drafted a letter to the Joint Venture's investors (the "Solicitation Letter"). Id. at 43. Sims reviewed the text of the Solicitation Letter and did not suggest any changes. Id. at 457-58. The Solicitation Letter reads, in pertinent part:

> [A]n **immediate problem** we all need to address is that the newly appointed Trustee will not authorize the expenditures necessary for the Venture to prepare the income tax returns for the separate partnerships or the Form K-1's for each of you individual investors.
>
> Thus, Intercept [sic] Monitoring Corporation has arranged to prepare the tax returns and K-1's for each of you and to mail them to you just as soon as they are completed. To facilitate the tax return preparation process, it will be necessary for each investor to **immediately** send a nominal fee of **$50**.
>
> Please make your check for **$50 payable** to **Tax Preparation, Inc.** and mail it to:

**TAX PREPARATION, INC.**
**9678 E. ARAPAHOE ROAD**
**SUITE 133**
**GREENWOOD VILLAGE, CO 80112-3703**

Id. at 43. Sims knew that the Solicitation Letter was going to be sent out to the Joint Venture's investors and that any money remitted was going to go to Tax Preparation, Inc., a corporation he was preparing to incorporate for Defendant. Sims stated that he had no problem with Defendant's plan to solicit money for the preparation of the K-1s. Id. at 457.

Sometime prior to March 14, 1996, Sender telephoned James Massaro, an accountant, and asked him if his firm could prepare the partnership returns and K-1s for the Joint Venture and the Funds. Id. at 90-91, 355. Massaro agreed to perform the work. On March 14, 1996, Sender met with James Markus, the lawyer hired by the Partner Committee, and told him that he had retained Massaro to do the returns and K-1s. Id. at 115, 353-56. That same day, Defendant rented box 113 at the Pak Mail Center located at 9678 Arapahoe Road in Greenwood Village, Colorado, in the name of Tax Preparation, Inc. Id. at 279. On March 15, 1996, Sims incorporated Tax Preparation, Inc. with Defendant as its sole director. Id. at 336, 343.

During this general time period, Defendant canceled a trip to Hawaii he and his wife had planned for March 21, 1996. Defendant's wife indicated that the trip was canceled and later rescheduled for April 17, 1996, so that Defendant could

work on the K-1s.  Id. at 510-11.  In addition, she indicated that he set up three computers, a printer, and a fax machine in their basement for use in preparing the K-1s.  Id. at 511.  Defendant also spoke with Bain and John Picon, a former employee of IMC, about assisting him in preparing the partnership tax returns and K-1s.  Id. at 483, 519.  They discussed the amount each would be paid for their services and the type of computer hardware required.  Id. at 484, 520.  Bain believed that Defendant had all the data needed to do the K-1s.  Id. at 484.

On March, 18, 1996, Defendant hired Direct Mail Services to send a copy of the Solicitation Letter to 4170 investors via first class mail.  Id. at 43, 133-135.  The Solicitation letter was written on SDG and IMC letterhead which listed the address of the Joint Venture, the same location where SDG and IMC had their offices until Defendant's resignation.  Id. at 43.  The phone number, which still rang in the offices of the Joint Venture, was blacked out.  Id. at 43, 160.  A pre-addressed envelope bearing Tax Preparation, Inc.'s address was included.  Defendant paid Direct Mail Services $1440 by personal check for the mailing.

The next day, March 19, 1996, Sender met with Massaro to discuss further Massaro's preparation of the partnership returns and K-1s.  Id. at 90-91.  On March 20, 1996, investors began receiving the Solicitation Letter and sending their checks for $50 to Tax Preparation, Inc.  Id. at 181-82, 230-31.  Shortly thereafter, both Hearty and Bain were given copies of the letter.  When Hearty

told Defendant that she was shocked by the Solicitation Letter, he laughed. Id. at 161. When Bain spoke with Defendant about the Solicitation Letter, Defendant admitted sending it and asked, "[c]an you believe these people are sending me checks?" Id. at 501.

Defendant opened a checking account in the name of Tax Preparation, Inc. on March 25, 1996. He deposited over $16,000 worth of individual investors' $50 checks between March 25, 1996, and April 8, 1996. Also on March 25, 1996, David Baston, chairman of the Partner Committee, sent his own letter to the investors informing them that the Joint Venture had retained an accountant to do the returns and K-1s and warning them not to send any money to Defendant. Id. at 44. After receiving Baston's letter, eighty-one investors were able to stop payment on their checks to Tax Preparation, Inc. Id. at 264. After deducting those amounts and penalties, the net deposits to the Tax Preparation, Inc. account totaled $12,369. Id. at 430.

On April 12, 1996, Defendant wrote two checks on the Tax Preparation, Inc. account. The first was to himself for $2000, which he cashed. Id. at 245-47. The second was made out to IMC for $5000. Id. Defendant deposited the latter check into IMC's account on the same day. Defendant had authority over the Tax Preparation, Inc. and the IMC bank accounts. The money Defendant deposited into the IMC account was used to pay for three premium payments on his life

insurance policy, two overdue lease payments on his Jeep Cherokee and fees he owed to a legal reporting service. Id. at 256, 259-60, 262-63, 291. On July 11, 1996, Defendant wrote another check on the Tax Preparation, Inc. account for $5360 and deposited that check into his personal checking account. Id. at 247, 300-01. The next day, Defendant wrote a check for $10,000 on his personal checking account to Sims' law firm for outstanding legal fees. Id. at 304-05. The ending balance of the Tax Preparation, Inc. account on July 31, 1996, was $4.67.

Neither Defendant nor Tax Preparation, Inc. ever prepared the partnership returns or K-1s. Defendant did not follow up with Bain or Picon on his discussions with them about preparing the tax forms. In addition, he did not refund any money to any of the investors and did not respond to refund requests made by an individual victim and the Partner Committee. Id. at 69, 359-62.

After Defendant's conviction, the district court held a hearing on his post-conviction motion for acquittal. At the hearing, the court expressed its surprise at the verdict and threatened the government that if they did not produce something convincing in their next filing, Defendant's motion would be granted. Id. at 53. The district court finally issued a one sentence order denying the motion to acquit some sixteen months after the trial. Defendant was sentenced to four months in prison, followed by three years of supervised release, and ordered to pay a $2000 fine and $5050 in restitution. This appeal followed.

## II. DISCUSSION

In order to convict Defendant of mail fraud under 18 U.S.C. § 1341, the government must prove that he: (1) devised or participated in a scheme to defraud or obtain money through false or fraudulent pretenses, representations, or promises; (2) had a specific intent to defraud; and (3) used the United States mails to execute his scheme. United States v. Deters, 184 F.3d 1253, 1257 (10th Cir. 1999); 18 U.S.C. § 1341. Defendant contends that the evidence failed to prove beyond a reasonable doubt that he specifically intended to defraud the limited partners when he mailed them the Solicitation Letter.

Whether the evidence was sufficient to sustain the jury's verdict and Defendant's conviction is a question of law which we review de novo. United States v. Jackson, 213 F.3d 1269, 1283 (10th Cir. 2000). We must determine "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999) (quotation omitted). We will disturb the jury's verdict only if our review leads us to conclude that no reasonable jury could have found that Defendant intended to defraud the limited partners, and was, therefore, guilty beyond a reasonable doubt.

-11-

Because intent to defraud is difficult to prove by direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. For example, "[i]ntent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." United States v. Prows, 118 F.3d 686, 692 (10th Cir. 1997) (quoting Kathleen Flavin & Kathleen Corrigan, Eleventh Survey of White Collar Crime: Mail Fraud and Wire Fraud, 33 Am. Crim. L. Rev. 861, 869-70 (1996)). In addition, failure to respond to requests for refunds by victims is also probative of fraudulent intent. United States v. Masten, 170 F.3d 790, 795 (7th Cir. 1999).

It is clear that Defendant made misrepresentations in the Solicitation Letter that he sent to investors. In the Solicitation Letter, he claimed that Sender would not authorize the expenditures necessary to prepare the partnership returns and K-1s. The evidence proves the falsity of this claim. Sender had already retained Massaro to prepare the returns and K-1s several days before the Solicitation Letter was sent. In addition, Defendant's use of Tax Preparation, Inc. in the Solicitation Letter was clearly misleading. A reasonable person would have understood the Solicitation Letter to mean that IMC had hired an accounting firm to prepare the returns and K-1s and that the $50 requested would be used to pay the fees of that firm.

-12-

Defendant argues, however, that at the time he sent the Solicitation Letter, he believed it to be truthful and had no knowledge that it was misleading. As to his statement about Sender's refusal to prepare the returns and K-1s, he points to the testimony of Hearty and Bain, both of whom indicated that Sender said he was not going to do the returns or had not decided whether or not to do them. However, the jury could have discounted their testimony on credibility grounds because both were impeached to some extent by statements made to investigators and in their grand jury testimony. See Appellant's App. at 173, 497. Moreover, the jury could have reasonably concluded that if Sender said he was not going to prepare the returns, he meant that they would not be prepared internally as had traditionally been done, but rather would be prepared by an outside accountant. Significantly, Defendant did not contact, and made no attempt to contact, Sender to discover his intentions. Although we cannot say with surety whether Defendant knew his statement about Sender was false, we believe that he did not know it to be true either.

As to the use of Tax Preparation, Inc., Defendant claims he was not deceptive because he did not conceal his identity in the incorporating documents of Tax Preparation, Inc. or in his rental of box 133 at the Pak Mail Center. Even so, it is unreasonable to think that an investor receiving the Solicitation Letter would investigate the matter and discover Defendant's involvement. Defendant

must have understood that the use of Tax Preparation, Inc. would lead investors to believe that an independent accounting firm was going to prepare their K-1s. Moreover, he knew that was not the case. As a result, we conclude that Defendant's use of Tax Preparation, Inc. in the Solicitation Letter was a knowing misrepresentation.

As evidence of his intent to prepare the returns at the time he sent the Solicitation Letter, Defendant brings to our attention the advice he received from Sims, his counsel. Sims told Defendant that IMC, as the non-bankrupt general partner of five non-bankrupt partnerships, had the responsibility to prepare the partnership returns and K-1s for those five Funds. Id. at 451-54. Sims' advice must be considered in light of two other pieces of evidence, however. The first is the fact that the IRS accepted the partnership returns prepared by Massaro and signed by Sender as Trustee. The second is the fact that even if Defendant was technically responsible to prepare and sign the partnership returns for the five Funds for which IMC was a general partner, he had no authority or responsibility to prepare the Joint Venture's partnership return or K-1s after his resignation. Moreover, he could not prepare the returns for the Funds unless he had received the K-1s from the Joint Venture indicating the profit or loss allocable to each of the Funds as partners of the Joint Venture. Defendant never contacted Sender to

discuss when he might get the K-1s for the Funds he controlled through IMC.[2]

These facts call into question Defendant's assertion that he, on the advice of counsel, intended to prepare the partnership returns and K-1s for the entire venture.

The undisputed evidence also shows that Defendant failed to prepare the investors' K-1s, used the money sent by investors for his personal expenses and made no response to requests for refunds. From these facts and the misrepresentations made in the Solicitation Letter, the jury may have reasonably inferred that Defendant intended to defraud the investors when he sent them the Solicitation Letter. See Prows, 118 F.3d at 692; Masten, 170 F.3d at 795.

Admittedly, the evidence of Defendant's guilt is not overwhelming. However, in order for us to vacate Defendant's conviction on appeal, he must convince us that the evidence was so lacking that no reasonable jury could have

---

[2]Even if Defendant had, as Bain believed, all the information necessary to prepare all of the returns and K-1s, including those of the Joint Venture, he did not have the authority to prepare, sign or file the Joint Venture's return and K-1s after his resignation. In addition, had Defendant merely prepared a "draft" return for the Joint Venture solely for the purpose of discovering the amounts allocable to the Funds controlled by IMC, he would have been foolish to base the Funds' returns and K-1s on the draft return because he could not be sure that the official Joint Venture return would exactly match his draft. Regardless of whether he had the legal obligation to prepare the Funds' returns, he could not proceed without first having received the K-1s for those Funds from the Joint Venture. We find it hard to believe that Defendant thought that he could complete the partnership tax returns and investor K-1s without collaborating with Sender and the Joint Venture.

-15-

found him guilty of mail fraud. He has not done so. After carefully reviewing the record, we conclude that the evidence therein, when viewed in the light most favorable to the government, provided a sufficient basis from which a reasonable jury could have found Defendant guilty beyond a reasonable doubt.


### III.  CONCLUSION

For the foregoing reasons, we AFFIRM Defendant's conviction.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge